[Cite as *In re D.G.*, 2023-Ohio-4427.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE  D.G.                                    :

                                               :          No. 112828

A Minor Child                                  :

[Appeal by Mother]                             :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  December 7, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22903161

---

### *Appearances:*

Gregory T. Stralka, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Zachary J. Lafleur, Assistant Prosecuting
Attorney, *for appellee.*

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Appellant mother appeals from a judgment of the juvenile court granting permanent custody of her child D.G. to the Cuyahoga County Department of Children and Family Services (hereafter "agency").  Our review reflects that the juvenile court properly engaged in the two-part analysis set forth in R.C. 2151.414

and that clear and convincing evidence supports the court's decision granting permanent custody. Accordingly, we affirm the juvenile court's decision.

**Substantive Facts and Procedural Background**

{¶ 2} This is the third custody case for D.G. In the first case, D.G. was placed in the emergency custody of the agency in August 2016. He was adjudicated dependent due to a diagnosis of "failure to thrive." Mother, who had substance-abuse issues, failed to consistently feed him, and he was malnourished and underweight. In January 2017, D.G. was committed to the temporary custody of the agency. In July 2018, temporary custody was terminated and D.G. was reunited with mother with protective supervision.

{¶ 3} In the second case, D.G., less than a year after being reunited with mother, was again returned to the emergency custody of the agency. He was adjudicated neglected and dependent for reasons substantially similar to the first adjudication, and the agency moved for permanent custody. The GAL for D.G., however, recommended an extension of temporary custody instead. In July 2019, the trial court denied the agency's request and placed the child in the temporary custody of the agency. In December 2020, the temporary custody of the agency was terminated and D.G. was reunited with mother again.

{¶ 4} In the instant case, 15 months after being reunited with mother, on March 29, 2022, D.G. was placed in the emergency custody of the agency for the third time. On the same day, the agency filed the instant complaint alleging D.G. was neglected and requested temporary custody. The complaint alleged that D.G.

has complex medical conditions requiring preventive medications and regular medical screenings but mother has failed to fill prescriptions since July 2021, and failed to take D.G. to necessary medical appointments since September 2021. The agency alleged that mother was overwhelmed with D.G.'s special needs and unable to consistently address those needs.

{¶ 5} On July 1, 2022, the trial court adjudicated D.G. dependent for the third time for similar reasons in the prior two adjudications and returned him to the temporary custody of the agency. On October 22, 2022, the agency moved for permanent custody. On May 18, 2023, the trial court held a hearing on the agency's motion.

**Trial Testimony**

{¶ 6} Social worker Gohnnie Jackson testified for the agency. The child's GAL also testified regarding his recommendation to grant permanent custody. Jackson was the caseworker for the family for a part of the first custody case and for the entire duration of the second and instant custody cases. She testified that during the first and second cases, the agency was concerned with mother's inability to meet D.G.'s medical needs and her substance use and housing issues. Mother successfully worked with the case plan and was reunited with the child in these prior cases.

{¶ 7} In the instant case, mother's case plan included engaging in substance-abuse and mental-health services, acquiring housing, and meeting the child's basic needs. She was referred to Moore Counseling for mental-health and substance-abuse assessments. She completed the assessments in June 2022 but did not engage

in services recommended by Moore Counseling due to an unwillingness to stop using marijuana. She did not want to start participating in the services until after her birthday in July, and then wanted to delay it until after the holidays. She eventually decided to go to Community Assessment Treatment Services and completed the substance-abuse assessment in January 2023. She then engaged in intensive and nonintensive outpatient services offered there, completing the services the day before the permanent custody hearing, held on May 18, 2023. Mother last tested positive on March 16, 2023, but the agency did not consider two months of sobriety sufficient to demonstrate substantial compliance with the case plan, in light of her seven-year history of substance abuse, in particular marijuana, and relapses. While mother completed substance-abuse services, the agency was concerned she did not benefit from the program.

{¶ 8} D.G., born in November 2012, has been under the care of University HospitalS Comprehensive Care Clinic since birth. He is also cared for by multiple specialists in the Aerodigestive Clinic, including a gastroenterologist doctor, a pulmonary specialist, and a cardiologist. He has struggled with proper weight gain all his life and, during some periods of his life, a "G-tube" was required to help him gain weight. According to the social worker, D.G. "would gain weight and then we would send him back, unify him [with mother], and then he would lose weight." Regular medical appointments with his medical providers are essential for his health. Since March 2022, of the nine appointments scheduled for D.G., mother attended three appointments; she attempted to attend two other appointments but

they were cancelled for reasons unrelated to her. Mother was adamant she would not attend the Comprehensive Care appointments because she did not agree with the providers there regarding D.G.'s care. She wished to switch providers, but the agency believed D.G. should continue to be cared for by the same providers who were involved in his medial treatment all his life. A week before the permanent custody hearing, mother for the first time attended D.G.'s appointment with the Comprehensive Care providers. D.G. was still underweight, and the plan to increase his weight included putting him back on the "G-tube" for overnight feedings. D.G., about to enter puberty, was very upset about it, but mother did not appear to comfort him or show any emotions.

{¶ 9} Regarding the mental health component of the case plan, the agency had some concerns with mother's mental health primarily because of her continual inability to appreciate D.G.'s medical needs and failure to consistently attend his medical appointments or fill his prescriptions. She completed an assessment and was not found to be in need of mental health therapy. The agency considered this component of the case plan completed.

{¶ 10} The social worker described D.G. as a bright child but he has some speech issues due to vocal cord paralysis; he also received therapy to address his emotions. Since his removal in March 2022, he is in the same foster home, which also fostered him in the second custody case. The social worker described the foster home as loving and stable. The foster mother has three adoptive children and fosters three children, including D.G. D.G. considers them his family and calls the other

children his brothers and sisters. According to the social worker, "[h]e enjoys being there. He feels safe there and he knows that his needs are going to be met * * * while he's there."

{¶ 11} Mother provided the agency the name of a paternal aunt for a possible placement for D.G., but the agency learned that she did not have appropriate housing and was unable to care for D.G. The agency withdrew the home study referral for the aunt, and she did not follow up with the agency regarding her potential as a placement for D.G. When asked about his preference for placement, D.G. indicated his preference would be his aunt, his mother, and the current foster parents, in that order.

{¶ 12} As the social worker testified, D.G. and his mother love each other and they have a loving relationship. Mother's visitation with D.G. took place twice a month in a library. Mother attends them consistently and would usually bring D.G.'s brother, who is also in the temporary custody of the agency, as well as other family members. D.G. was always happy to see his mother and other family members, but mother did not seem to engage with him much during these visits and was content with having him interact with other family members.

{¶ 13} The agency was also concerned with mother's chronic lack of stable housing. When the instant case was filed, she resided in a boarding house but later moved out due to her inability to pay rent. She then stayed with one of her children's paternal grandparents. At the time of the hearing, she was homeless and living from place to place; the agency was only told she is on a waiting list for certain low-income

housing. She was unable to provide any information to the agency regarding the places she was staying at or their suitability for D.G. The agency encouraged her to apply to Cleveland Metropolitan Housing Authority ("CMHA") or to stay temporarily at a shelter where a case manager would be assigned to assist her with acquiring housing, but she was not interested in either option.

{¶ 14} The GAL reported that while he had recommended a denial of permanent custody in the second case, he would now recommend a grant of permanent custody. He stated that despite his hope, mother did not seem able to meet the child's needs, pointing to her current homelessness as one of the factors he considered. The GAL did not believe mother could be reunified with D.G. within the next several months if an extension of temporary custody was granted. He observed the most recent visitation. While he agreed that Mother and D.G. love each other, he noted that, during the 45 minutes of his observation, Mother did not interact with D.G. much.

{¶ 15} D.G. was appointed separate counsel to represent his wishes. Counsel reported at the hearing D.G.'s wishes to be reunited with his mother ultimately and asked for an extension of temporary custody to be granted instead of permanent custody.

{¶ 16} The trial court granted permanent custody to the agency, and mother's appeal follows. On appeal, mother raises the following two assignments of error for our review:

I. The trial court's decision granting permanent custody was contrary to the best interests of the child since it was against the manifest weight of the evidence.

II. The Appellee/CFS failed to establish permanent custody should be granted under the provisions of Ohio Revised Code 2151.414(E).

{¶ 17} We address the two assignments of error jointly as they are related.

**Standard of Review**

{¶ 18} We begin our analysis with the recognition that while a parent's right to raise a child is an essential and basic civil right, *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), children have the right to "parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

{¶ 19} Under Ohio's permanent custody statute, R.C. 2151.414, the juvenile court's judgment granting permanent custody must be supported by clear and convincing evidence. Clear and convincing evidence has been defined as "'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. We will not reverse a juvenile court's termination of parental rights and award of permanent

custody to an agency unless the judgment is not supported by clear and convincing evidence. *See, e.g., In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48; and *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

**Two-Part Analysis for Permanent Custody**

{¶ 20} R.C. 2151.414 sets forth a two-part analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists and, furthermore, permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 21} In the first part of the analysis, the juvenile court is to determine if any of the following factors exists: whether the child is abandoned (R.C. 2151.414(B)(1)(b)); whether the child is orphaned and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); whether the child has been in the temporary custody of public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); whether the child or another child of the parent has been adjudicated as an abused, neglected, or dependent child on three separate occasions (R.C. 2151.414(B)(1)(e)); or, whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." (R.C. 2151.414(B)(1)(a).)

{¶ 22} If any of these five factors under R.C. 2151.414(B)(1) exists, the trial court proceeds to the second part of the analysis — whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency. R.C. 2151.414(D)(1).

**Finding Under R.C. 2151.414(B)(1)(a)**

{¶ 23} Here, under the first part of the permanent-custody analysis, the trial court found the presence of R.C. 2151.414(B)(1)(a) factor — that D.G. cannot be placed with either parent within a reasonable time or should not be placed with either parent.[1]

{¶ 24} To make a finding under (B)(1)(a), R.C. 2151.414(E) enumerates 15 factors for the court to consider. In this case, the trial court found the presence of the factors set forth in R.C. 2151.414(E)(1), (E)(2), and (E)(4). R.C. 2151.414(E) states, in relevant part:

> (E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions

---

[1] As the agency notes on appeal, the factor in R.C. 2151.414(B)(1)(e)(the child has been adjudicated as an abused, neglected, or dependent child on three separate occasions) is also present in this case, although the trial court did not make the finding in its journal entry.

causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *[.]

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

{¶ 25} Our review of the record indicates that clear and convincing evidence supports the trial court's finding regarding the factors under (E)(1) (failing continuously and repeatedly to substantially remedy the conditions causing the child's removal), (E)(2) (having chemical dependency so severe such that the parent was unable to provide an adequate, permanent home), and (E)(4) (demonstrating a lack of commitment toward the child).

{¶ 26} This is the third time D.G. was removed from mother, adjudicated as dependent or neglected, and placed in the agency's temporary custody. D.G. was born in 2012. He has been under doctors' care since birth due to his "failure to thrive" and inability to gain weight. Since 2016, he was in and out of the agency's

custody because of mother's substance abuse and relapses and an inability to care for him.

{¶ 27} Regarding R.C. 2151.41(E)(2), the trial court found mother has a chemical dependency so severe as to make her unable to provide an adequate, permanent home for the child. Mother's substance abuse has been an ongoing concern for the agency since 2016. D.G. was removed from mother three times, and each time he was adjudicated as dependent and neglected in large part due to mother's substance abuse and the resulting inability to provide a stable home for D.G. Despite being at risk for losing the custody of her child, she told the social worker at one point that she was not going to stop using marijuana; she was reluctant to start the substance-abuse services and did not complete them until the day before the hearing.

{¶ 28} Regarding R.C. 2151.41(E)(1), while mother eventually completed substance-abuse services, she only demonstrated two months of sobriety as of the hearing. In light of mother's long history of substance abuse and relapses, we agree with the trial court that mother's eleventh-hour efforts are not sufficient to demonstrate substantial compliance with the substance-abuse component of her case plan. As to housing, at the time of the hearing, she did not have a suitable home for D.G. She also ignored the social worker's suggestion to enter a shelter, which would expedite the process of obtaining housing, and she was also unwilling to consider housing at CMHA.

{¶ 29} Regarding R.C. 2151.414(E)(4), the record also supports the trial court's finding that mother has demonstrated a lack of commitment toward the child by failing to ensure that the child's medical needs are met. D.G. has struggled with being underweight all his life. Mother minimized D.G.'s health issues. She disliked the team of medical professionals in the Comprehensive Care Clinic who have cared for D.G. since he was born, because they would hold her accountable when she did not follow through with the prescribed treatments for D.G. She was adamant about not attending any appointments with them and missed several appointments scheduled with these providers. She also failed to ensure D.G.'s prescriptions were filled.

{¶ 30} Pursuant to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(15) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. Because our review reflects clear and convincing evidence relating to the factors under (E)(1), (E)(2), and (E)(4), the trial court properly found the presence of R.C. 2151.414(B)(1)(a) factor — that D.G. cannot be placed with mother within a reasonable time or should not be placed with mother.

**Best Interest of the Child**

{¶ 31} Once the juvenile court determines that one of the five factors listed in R.C. 2151.414(B)(1) is present, the court proceeds to an analysis of the child's best interest. The court undertakes this analysis with the recognition that although

parents have a constitutionally protected interest in raising their children, that interest is not absolute and is always subject to the ultimate welfare of the child. *In re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 7; and *In re N.M.*, 8th Dist. Cuyahoga No. 106131, 2018-Ohio-1100.

{¶ 32} In determining the best interest of the child, R.C. 2151.414(D)(1) instructs the juvenile court to consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 33} When analyzing the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Furthermore, the juvenile court is afforded considerable discretion in weighing the factors. *In re K.P.*, 8th Dist. Cuyahoga No. 107577, 2019-Ohio-181, ¶ 36.

{¶ 34} Here, the trial court stated that it found by clear and convincing evidence that a grant of permanent custody is in the best interest of the child after consideration of the interaction and interrelationship with his parents, siblings, relatives, and foster parents; the wishes of the child; the child's custodial history, including whether the child has been in temporary custody of the agency for 12 or more months of a consecutive 22-month period; the child's need for a legally secure permanent placement; and the report of the GAL, who recommend permanent custody to the agency.

{¶ 35} Here, the record contains the social worker's testimony that D.G. loves his mother and they have a loving relationship. D.G. has also expressed his preference of being placed with mother over his foster family. However, no one factor under R.C. 2151.414(D) is to be given more weight than the others. *In re T.H.*, 8th Dist. Cuyahoga No. 100852, 2014-Ohio-2985, ¶ 23. In this case, the factors against a grant of permanent custody are outweighed by the factors in favor of it. This is the third time D.G. was in the agency's temporary custody due to mother's substance abuse, chronic lack of housing, and failure to meet his medical needs. He was in the agency's custody from August 2016 through July 2018, from February 19 through December 2020, and, from March 2022 through May 2023. The GAL, having previously disagreed with the agency's request for permanent custody, determined that it is now in the best interest of the child to grant permanent custody to the agency.

{¶ 36} Although it is evident from the trial testimony that D.G. loves his mother, "the mere existence of a good relationship is insufficient." *In re T.W.*, 8th Dist. Cuyahoga Nos. 86084, 86109, and 86110, 2005-Ohio-6633, ¶ 15. Rather, the court must consider the best interest of the child, and "a child's best interests require permanency and a safe and secure environment.'" *In re K.M.*, 8th Dist. Cuyahoga No. 95374, 2011-Ohio-349, ¶ 23, quoting *In re Holyak*, 8th Dist. Cuyahoga No. 78890, 2001 Ohio App. LEXIS 3105 (July 12, 2001). D.G. has a right to a stable and permanent home, and his custodial history demonstrates that mother is simply unable to provide it.

{¶ 37} In affirming the trial court's judgment granting permanent custody, we are mindful that "'[i]n proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record.'" *In re V.M.*, 4th Dist. Athens No. 18CA15, 2018-Ohio-4974, ¶ 62, quoting *Trickey v. Trickey*, 158 Ohio St. 9, 106 N.E.2d 772 (1952). "'The discretion that the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re Ch. O.*, 8th Dist. Cuyahoga No. 84943, 2005-Ohio-1013, ¶ 29, quoting *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d

424 (1994). Having reviewed the record, we find the trial court's best-interest determination is supported by clear and convincing evidence in the record.

{¶ 38} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

LISA B. FORBES, J., and
MARY J. BOYLE, J., CONCUR