[Cite as *In re Y.F.*, 2024-Ohio-5604.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE Y.F. | : | |
| | | No. 114040 |
| A Minor Child | : | |
| [Appeal by CCDCFS] | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED
**RELEASED AND JOURNALIZED:** November 27, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22905513

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellant*.

Rachel A. Kopec, *for appellee* M.F.

MICHAEL JOHN RYAN, J.:

{¶ 1} The Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency") appeals from the trial court's June 12, 2024 judgment denying the agency's motion for permanent custody of the subject minor child, Y.F., and granting the motion of M.F., the child's father ("Father"), for legal custody with protective supervision to his parents, Y.F.'s grandparents. After a thorough review of the facts and pertinent law, we reverse.

**Procedural History**

{¶ 2} In May 2022, Y.F. was placed into the agency's custody pursuant to an ex parte telephonic order. Thereafter, the agency filed a complaint on June 1, 2022, alleging that the child was abused and dependent and requesting a dispositional order of temporary custody to CCDCFS. After a hearing, the juvenile court granted emergency predispositional custody of Y.F. to CCDCFS. Thereafter, the child was adjudicated abused and dependent and placed in the agency's temporary custody. Temporary custody was extended in May 2023, and in June 2023, CCDCFS filed a motion to modify temporary custody to permanent custody. The juvenile court held a trial on CCDCFS's motion and thereafter issued its judgment in which it denied the agency's motion for permanent custody and ordered the child placed in the legal custody of her paternal grandparents with protective supervision. CCDCFS appeals, raising the following sole assignment of error for our review: "The trial court judgment denying CCDCFS's motion for

permanent custody in favor of an order of legal custody to the grandparents with an order of protective supervision is contrary to the evidence presented at trial."

**Factual History**

{¶ 3} The record demonstrates that Y.F. was born in early 2020. The agency became involved with the family in 2022, after a domestically violent incident between A.S., the child's mother ("Mother"), and Father occurred; Y.F. was two years old at the time. The child was placed with the paternal grandparents with a safety plan.[1] The safety plan set forth that neither Mother nor Father were permitted to be with Y.F. unsupervised. The grandparents violated the safety plan by allowing Father to take Y.F. for a long weekend when they were going out of town. After they returned from their trip, the grandparents self-reported and Y.F. was removed from their care in May 2022. Following the child's removal from her grandparents, a case plan was developed for Mother and Father in an effort to effectuate a permanency plan of reunification.

{¶ 4} Mother's case plan included services to help address mental health, substance abuse, basic needs, parenting, and domestic violence. In the fall of 2023, Mother gave birth to another child, U.S.; U.S. was born exposed to drugs, removed

---

[1] The record demonstrates that prior to CCDCFS's involvement with the family, Y.F. was cared for by the paternal grandparents for approximately six weeks after her birth because Mother and Father had issues that prevented them from initially caring for her.

from Mother's care, and placed with the same foster family as Y.F.[2]  Mother was asked to submit to random drug screens, with which she was compliant;  however, the last drug screen that the agency had for her — February 2024 — was positive. Further, just prior to trial, Mother self-reported that she was still using marijuana.

{¶ 5}  Regarding basic needs, Mother was able to obtain housing, but she was not employed.  At the time of trial, Mother reported that she was receiving $940 monthly in SSI benefits.  Mother's basic needs were an ongoing concern to CCDCFS because her monthly rent obligation, exclusive of utilities, was $950.  Mother did complete the parenting portion of her case plan but, as will be discussed, due to Y.F.'s aggressive behavior after her visits with Mother, Mother's visitation with the child was limited.  Mother completed domestic violence services, and CCDCFS did not have any concerns about that portion of her case plan at the time of trial.

{¶ 6}  Regarding mental health, Mother was diagnosed with post-traumatic stress disorder ("PTSD"), anxiety, cannabis use disorder, and intermittent explosive disorder.  She had been involved with a provider, but her participation was inconsistent, which led to her discharge.  CCDCFS asked Mother to reengage, which she did, but she was again inconsistent.  At the time of trial, the agency had ongoing concerns for Mother's mental health.

---

[2] Y.F. and U.S. have different fathers.  Mother's parental rights of U.S. were terminated, and Mother has appealed in a companion case to this case; Mother also challenges the juvenile court's order of legal custody of Y.F. to the paternal grandparents in that case. *See In Re Y.F., et al.*, 8th Dist. Cuyahoga No. 114140.

{¶ 7} Father was incarcerated in January 2023 (for charges not related to this case); according to grandmother, he is not expected to be released until 2027. Prior to his incarceration, he had an opportunity to work on his case plan, which included services to help address mental health, domestic violence, parenting, and basic needs. Father refused to engage in mental health and domestic violence services and both remained a concern for the agency throughout the case. He started parenting and basic needs services but then refused the services. Father had supervised weekly visitation with Y.F. He initially attended the visits, but then stopped (prior to his incarceration).

{¶ 8} After Y.F. was removed from her grandparents care, she was placed with a foster family in whose care she has continually remained.[3] The child was examined by a medical professional prior to her placement with the foster family; the examination did not include a pelvic exam.

{¶ 9} Y.F.'s foster mother testified at trial. According to the foster mother, Y.F. was nonverbal when she came into the family's care at two years old. The child was engaging in aggressive behaviors, such as biting and screaming. She would "hide" in a corner as if she was "protecting herself," had "extreme" nightmares, and initially appeared afraid of the foster father, especially at bedtime. Y.F. also displayed aggressive behaviors at her daycare provider.

---

[3]This court granted a stay of the juvenile court's judgment granting legal custody of Y.F. to the grandparents during the pendency of this appeal.

{¶ 10} Within a day of Y.F. being with the foster family, the foster mother suspected that the child had a yeast infection and took her to a doctor. The foster mother testified that Y.F. displayed aggressive behaviors at the visit with the doctor. It was confirmed at the visit that the child had a severe yeast infection. In July 2022, Y.F. began treating with a therapist, Constance Oliphant.

{¶ 11} Oliphant and the agency's case worker assigned to this case, Amy Norris, testified at trial. After assessing Y.F., Oliphant found that the child was experiencing PTSD symptoms. According to Oliphant, the child had difficulty communicating specifics that might have explained her symptoms, but Oliphant was able to glean from Y.F. that she felt safe with her foster parents and wanted to stay with them.

{¶ 12} When Y.F. was placed with the foster parents, she initially continued having visits with Mother and her grandparents. The visits were supervised and generally occurred together — that is, Mother and grandparents would visit with Y.F. at the same time. The record demonstrates that Mother and the paternal grandparents had a difficult relationship, but Mother was initially open to them visiting with Y.F. The record further demonstrates that there were times when the grandparents were not present at the visits, and Y.F. visited with only Mother. According to the foster mother, Y.F.'s aggressive behaviors would worsen after the visits, and especially after the visits where the grandparents were present.

{¶ 13} Oliphant testified to the same escalation in Y.F.'s behavior after visits with Mother and the grandparents. One of the concerning things were nightmares

Y.F. was having in which she saw a "monster." Oliphant presented a photographic "lineup" to Y.F. with pictures of various people in her life including Mother, Father, foster mother, foster father, and the paternal grandparents; pictures of Y.F.'s maternal relatives were not included because they were not involved in her life. Oliphant asked Y.F. if she saw the "monster" in the lineup, and Y.F. identified grandfather. Oliphant testified that she did not take Y.F. to be a "liar" or as having been "coached."

{¶ 14} Y.F.'s behavior escalated in a particularly concerning manner after one of the visits with the grandparents. Specifically, after the visit Y.F. engaged in "graphically violent sexualized behavior." The child also regressed with her potty-training efforts. This behavior prompted Oliphant to write a letter to the agency suggesting that the visits be limited or stopped altogether. Mother, who as mentioned, initially was open to the grandparents visiting with Y.F. and shared her visiting time with them, also expressed her desire for the grandparents' visits to stop. The agency stopped the grandparents' visits and later, also at Oliphant's request, limited Mother's visitation. Oliphant testified that Y.F.'s behavior markedly improved after her visits with the grandparents ceased and same after Mother's visits were limited.

{¶ 15} Norris, the agency worker assigned to the case, corroborated much of Oliphant's testimony regarding Y.F.'s concerning behavior and how it escalated after visits with the grandparents. Norris supervised the visits and admitted that she did not see the grandparents engaging inappropriately with Y.F.

{¶ 16} Regarding Mother's visits with Y.F., Norris testified that Y.F. did enjoy some of the visits, especially when Mother had gifts for her. However, at other times, the visits were upsetting to Y.F. because Mother would have "outbursts." Norris described one particularly upsetting visit in April 2024. Y.F. had a bathroom accident. Mother became upset because she thought that Y.F.'s accident was due to what she believed was Y.F.'s "trauma due to sexual abuse." Mother ran at Y.F., who was running toward a wall, and the two fell into the wall. Mother then picked Y.F. up in a "very physical" manner. Y.F. was scared and hid under a table; Mother continued yelling and, despite Norris attempting to calm her down and redirect her, Mother disengaged for the remainder of the visit.

{¶ 17} It is intimated in the record that Mother believed the grandfather had sexually abused Y.F. prior to the agency's involvement with the family in 2022. The record indicates that Mother had reported that the grandfather made inappropriate sexual comments to her (the Mother). Norris testified that CCDCFS investigated the grandfather for sexual abuse and found the claim unsubstantiated. Norris testified that unsubstantiated does not mean that nothing happened; rather, it means that the agency could not reach a conclusive determination. There is no process to appeal the determination. According to Norris, part of the reason for the unsubstantiated determination was because Y.F. was not able to articulate well. Norris also corroborated Oliphant's testimony that Y.F.'s concerning behavior decreased after her visitations with the grandparents stopped.

{¶ 18} Father presented his parents' testimonies on his behalf. Grandmother testified that grandfather works from home and she works outside of the house. They have been involved in Y.F.'s life since her birth, grandfather had been her primary caregiver, and Y.F. and grandfather were especially bonded. Grandmother testified that she was unaware of the safety plan when she and grandfather allowed Father to take Y.F. unsupervised for a long weekend.

{¶ 19} Grandfather corroborated grandmother's testimony about his bond with Y.F. and denied that he ever abused her. He testified that he thought the safety plan meant that only Mother could not be with Y.F. unsupervised. Grandfather admitted to a misdemeanor conviction for exposing himself to a "rather attractive" "20 something" woman. He was ordered to counseling as a result of the conviction.

{¶ 20} Mother did not present any witnesses.

{¶ 21} Prior to trial, Y.F.'s guardian ad litem ("GAL") submitted a report to the court recommending that it grant permanent custody of Y.F. to CCDCFS. The GAL maintained her position at trial.

**Juvenile Court's Judgment**

{¶ 22} Posttrial, the court issued its judgment in which it found "that the previous order placing the child in the temporary custody of the Division of Children and Family Services is terminated as it is no longer in the child's best interest." The court denied CCDCFS's motion for permanent custody and granted Father's motion for legal custody to paternal grandparents.

**Law and Analysis**

{¶ 23} An appellate court reviews a juvenile court's decision regarding a motion for permanent custody of a child to a children's services agency on sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence grounds. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. In this appeal, CCDCFS maintains that the juvenile court's decision was against the manifest weight of the evidence. In reviewing a juvenile court's decision regarding permanent custody on weight-of-the-evidence grounds,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*Id*. at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10.

{¶ 24} Under R.C. 2151.414, clear and convincing evidence is the standard of proof to be used by a juvenile court in determining whether the statutory requirements for permanent custody are met. Clear and convincing evidence is defined as

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986).

{¶ 25} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-

Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this State or another State. R.C. 2151.414(B)(1)(a)-(e). "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.*, 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 26} CCDCFS contends that it presented clear and convincing evidence of the finding under R.C. 2151.414(B)(1)(a), that Y.F. cannot be placed with either parent within a reasonable time or should not be placed with the child's parents. "To make a finding under (B)(1)(a), R.C. 2151.414(E) enumerates 15 factors for the court to consider." *In re D.G.*, 2023-Ohio-4427, ¶ 24 (8th Dist.).

{¶ 27} The R.C. 2151.414(E) factors that CCDCFS contends were evident by clear and convincing evidence are the following: (1) failure to remedy (R.C. 2151.414(E)(1)); (2) chronic chemical dependency/mental illness (R.C. 2151.414(E)(2)); (3) lack of commitment (R.C. 2151.414(E)(4)); (4) abandonment (R.C. 2151.414(E)(12)); (5) incarceration and unavailability (R.C. 2151.414(E)(12); and (6) other relevant factors (R.C. 2151.414(E)(16)). We consider each in turn.

{¶ 28} Regarding failure to remedy, the record demonstrates that Y.F. was removed from her parents' care due to issues of domestic violence, substance abuse, mental health, and parenting concerns and that a case plan was implemented to include services for Mother to address these issues. Mother's substance abuse issue remained a concern throughout the case. Mother gave birth to another child, U.S., in October 2023; U.S. was born exposed to drugs. Mother tested positive for drugs in February 2024, and just prior to trial she reported that she was still using marijuana.

{¶ 29} Mother was referred to mental health services based on her diagnoses of PTSD and anxiety and was involved with a provider, but her engagement was inconsistent. In August 2022, she was terminated from counseling services due to her noncompliance and did not reengage until September 2023; she was not consistent with her reengagement, however. A note from an April 2024 counseling session noted that the "overall impression of treatment demonstrates minimal improvement as evidenced by ongoing challenges in managing stress using healthy coping strategies."

{¶ 30} The abovementioned also demonstrated, by clear and convincing evidence, that Mother had a chronic chemical dependency and mental health issues, a factor set forth in R.C. 2151.414(E)(2), that were still unresolved at the time of trial. Thus, clear and convincing evidence supports findings under R.C. 2151.414(E)(1) and (2) relative to Mother.

{¶ 31} Regarding Father, he had an opportunity prior to his incarceration to work on his case plan, which included services to help address mental health, domestic violence, parenting, and basic needs. Father refused to engage in mental health and domestic violence services and both remained a concern for the agency throughout the case. He started parenting and basic needs services but then refused the services. This record supports a finding, by clear and convincing evidence, that Father failed to remedy under R.C. 2151.414(E)(1).

{¶ 32} Further, despite being afforded an opportunity to visit Y.F. prior to his incarceration, Father failed to see the child since August 2022. The record supports a determination, by clear and convincing evidence, under R.C. 2151.414(E)(4), that Father had a lack of commitment to Y.F. Moreover, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). Father stopped visiting Y.F. in August 2022. Thus, the record supports a determination by clear and convincing evidence under R.C. 2151.414(E)(10) that Father abandoned the child.

{¶ 33} Because of his incarceration and unavailability, the record also supports a determination under R.C. 2151.414(E)(12) because he will be unavailable for at least 18 months after the dispositional hearing.

{¶ 34} Under the catchall provision of R.C. 2151.414(E)(16), it is relevant that the child expresses fear of Mother and has stated that she feels safe with the foster family and wants to stay with them. Further, Y.F. had aggressive and sexualized behaviors after her visitations with the grandparents.

{¶ 35} On this record, CCDCFS presented clear and convincing evidence that at least one of the R.C. 2151.414(E) factors applied for both Mother and Father. "Once a court determines, by clear and convincing evidence, that one of the enumerated factors exists, the court must enter a finding that the child cannot or should not be placed with either of his [or her] parents within a reasonable time." *In re Glenn*, 139 Ohio App.3d 105, 113 (8th Dist. 2000). Having found that CCDCFS presented evidence to satisfy the first prong of a permanent custody motion, we turn to the second prong.

{¶ 36} Under the second prong of R.C. 2151.414, the juvenile court must consider the factors listed in R.C. 2151.414(D), as well as other relevant factors, to determine, by clear and convincing evidence, whether it is in the child's best interest to grant permanent custody to the agency pursuant to R.C. 2151.414(D). *In re H.G.*, 2024-Ohio-3408, ¶ 16 (8th Dist.). Those factors are:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 37} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent-custody determination, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Moreover, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 2015-Ohio-2410, ¶ 30 (8th Dist.).

{¶ 38} The trial court in this case summarily found "that the previous order placing the child in temporary custody of the Division of Children and Family Services is terminated as it is no longer in the child's best interest," without mention or discussion of the R.C. 2151.414(D)(1) factors. We recognize that the Ohio Supreme Court has held that R.C. 2151.414(D)(1) "does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.*, 2020-Ohio-5102, ¶ 31. However, the Court stated that it

"strongly encourage[s]" juvenile courts to address the best-interest factors. *Id.* at ¶ 32. But even if a juvenile court does not address the factors, a reviewing court "must be able to discern from the magistrate or juvenile court's decision, and the court's judgment entry," that the court considered the listed factors. *Id.* at ¶ 31. The trial court's summary determination that agency custody is not in Y.F.'s best interest, without more, does not allow us to find that it considered the best interest findings.

{¶ 39} After review, we find that all of the best interest factors were implicated in this case and weighed in favor of granting permanent custody to CCDCFS. Under R.C. 2151.414(D)(1)(a), which considers the interaction and interrelationship with significant persons in the child's life, the record reflects that Y.F. (1) feared Mother and did not want to live with her, (2) felt safe with her foster family and was bonded with her younger sister, U.S., who was also placed with the foster family, (3) Father stopped visiting with Y.F., and (4) Y.F. identified grandfather as the "monster" she saw in her nightmares.

{¶ 40} Regarding R.C. 2151.414(D)(1)(b), which considers the child's wishes as expressed by the child or the child's GAL, as mentioned, Y.F. expressed fear of Mother, stated that she did not want to live with her and that she felt safe and wanted to live with the foster family. The GAL also opined that she believed permanent custody was in Y.F.'s best interest.

{¶ 41} Considering the child's custodial history under R.C. 2151.414(D)(1)(c), the record shows that Y.F. was placed in CCDCFS's care on May 31, 2022, and the trial court's judgment was filed on June 12, 2024; during this time

Y.F. continuously remained in the agency's custody. Thus, Y.F. had been in agency custody for over two years.

{¶ 42} Under R.C. 2151.414(D)(1)(d), which considers the child's need for a legally secure placement and whether that can be achieved without a grant of permanent custody, in June 2024 when the trial court issued its judgment, Y.F. could no longer be maintained in temporary custody. *See* R.C. 2151.415(D)(4) ("[T]he court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have previously been ordered . . . .").

{¶ 43} As discussed, Father was unavailable due to his incarceration and, in any event, had not successfully completed his case plan goals. Mother likewise had not successfully completed her case plan goals, Y.F. was fearful of Mother and indicated that she did not want to be returned to her care; she felt safe with her foster family and wished to stay with them. Further, the GAL recommended permanent custody to the agency.

{¶ 44} Under R.C. 2151.414(D)(1)(e), consideration is to be given as to whether any factors under R.C. 2151.414(E)(7) to (11) apply. Subsection (E)(10) — whether the parent has abandoned the child — applies. As discussed, prior to his incarceration, and with the opportunity to visit Y.F., Father stopped visiting her for more than 90 days.

{¶ 45} On this record, the weight of the evidence weighed in favor of granting permanent custody to CCDCFS. We note that "[t]he willingness of a relative to care for a child does not alter what a court considers in determining whether to grant permanent custody." *In re E.C.*, 2016-Ohio-4870, ¶ 39 (8th Dist.). The same best-interest factors for permanent custody set forth in R.C. 2151.414(D) can be used as guidance for legal custody, which is considered under the lesser standard of preponderance of the evidence. *In re B.D.*, 2017-Ohio-8663, ¶ 25-26. Even considering the best-interest factors under the lesser standard, we find that the trial court erred in granting legal custody to the grandparents.

{¶ 46} In reaching our decision, we are mindful of the discretion that juvenile courts have in custody proceedings. But we are also mindful that a stated purpose of R.C. Ch. 2151 is "[t]o provide for the care, protection, and mental and physical development of children." We believe our decision will effectuate that for Y.F.

{¶ 47} CCDCFS's sole assignment of error is sustained.

{¶ 48} Judgment reversed.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EILEEN A. GALLAGHER, P.J., and
EILEEN T. GALLGHER, J., CONCUR