[Cite as *In re E.B.*, 2025-Ohio-101.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE E.B. | : | |
| | | No. 114265 |
| A Minor Child | : | |
| | | |
| [Appeal by Mother, A.H.] | : | |
| | | |
| | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 16, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22903476

---

### *Appearances:*

Christina M. Joliat, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

MICHAEL JOHN RYAN, J.:

{¶ 1} Appellant-Mother ("Mother") appeals the trial court's judgment granting permanent custody of E.B. to the Cuyahoga County Division of Child and

Family Services ("CCDCFS" or "agency"). After a thorough review of the facts and the law, we affirm.

{¶ 2} CCDCFS first became involved with the subject child, four-month-old E.B., in April 2022 after Mother was hospitalized due to a mental health crisis during which she expressed suicidal ideations as well as thoughts of harming the child. Following the child's removal, CCDCFS developed a case plan, which included services to address Mother's mental health, substance abuse, anger management, housing, employment, and required that Mother resolve her outstanding legal issues. On April 6, 2022, the agency filed a complaint alleging the four-month-old child was a dependent child and requesting temporary custody. The child was subsequently adjudicated dependent and was placed in the temporary custody of CCDCFS. The order of temporary custody was extended twice. On January 8, 2024, CCDCFS filed a motion to terminate temporary custody, but later withdrew the motion.

{¶ 3} On March 26, 2024, CCDCFS filed a motion to modify temporary custody to permanent custody for the child. Trial was set for July 22, 2024. On July 18, 2024, Mother filed a motion to continue the trial date. The court denied her motion and proceeded to trial.

{¶ 4} CCDCFS also included case plan services for the child's biological father, which included housing, employment, and parenting. The agency was unable to refer him to services because he was evasive and would not sign a release of information to allow for the referrals. At the time of trial, the father was

incarcerated on multiple criminal charges and had not visited the child since October 2023.[1]

**Mental Health**

{¶ 5} CCDCFS referred Mother to mental health services through a number of providers, including Bellfaire, New Visions, Signature Health, and CommQuest, but Mother was inconsistent in her engagement with these services. Mother completed a mental health assessment and was diagnosed with anxiety and depression, for which she was prescribed medication. Mother made the decision to quit taking her medication and, at the time of trial, could not show that she was engaged with a mental health service provider.

{¶ 6} Mother attempted suicide in June 2024 and was hospitalized. Mother told her CCDCFS case worker, Marshae Foy ("Foy"), that her suicide attempt was caused by stress. Mother testified that "I just decided one day I didn't want to live no more, so I took a bottle of pills. And that's that." Mother claimed she regretted the suicide attempt and would not try it again.

{¶ 7} Following Mother's hospitalization for the attempt, she was referred for a mental health or psychiatric evaluation but failed to attend her scheduled appointment. Mother testified that she had to work and forgot to reschedule. Although Mother was seeing Alexis Hadamuscin ("Hadamuscin") at CommQuest

---

[1] The child's father is not a party to this appeal; therefore, our analysis will focus on Mother.

for her mental health at the time of the attempt, she terminated her relationship soon thereafter.

{¶ 8} Hadamuscin testified that she worked with Mother on "basic communication and problem solving and stress management skills" but that she only saw Mother for five sessions. As of the trial date, CommQuest was no longer providing services because Mother requested her case be closed. Mother indicated that she stopped receiving CommQuest's services because she "didn't feel like it was helping."

{¶ 9} When discussing her mental health objectives with Foy, Mother indicated that she "doesn't feel like anything is wrong, that she doesn't need any further assistance or help." Two weeks before trial, Mother told Foy that she had reengaged in counseling services through another service provider, Wellness Growth, but the agency was unable to confirm this claim. During Mother's testimony, she stated that she did not currently have a mental health provider.

{¶ 10} Mother claimed that she was on a new medication for her mental health, but was unable to provide any details about the medication, and CCDCFS was unable to confirm Mother was taking medication for her mental health.

**Substance Abuse**

{¶ 11} Substance abuse services were included in Mother's case plan due to concerns that she was abusing marijuana and it was inhibiting her ability to provide appropriate care for the child. Mother did not have a medical marijuana card and admitted to using marijuana as a coping mechanism to help with her anxiety, stress,

and sleep. During one visit to Mother's home, the social worker noted a strong odor of marijuana. During that visit, Mother was not "attentive to the child at all."

{¶ 12} Mother completed a substance abuse assessment, as required by her case plan. It was recommended that Mother engage in intensive outpatient treatment, but Mother was inconsistent in her engagement with her substance abuse service provider, New Visions, and was discharged due to her behavior, attitude, and "her cursing out her health care provider."

{¶ 13} Mother submitted to drug testing through CommQuest, the results of which were positive and indicated high levels of marijuana use. Mother was asked to submit to random drug screens for CommQuest based on her having been diagnosed with cannabis use disorder and tested positive for marijuana on both occasions that she was tested in the month and a half prior to trial.

{¶ 14} At trial, Mother claimed, "I don't use a lot. I only smoke when I'm stressed out, otherwise, I don't smoke at all. And it's not every day." Mother testified that she would not use marijuana if the child were returned to her care, but was unable to state how she planned to cope with stressors in her life without marijuana should the child be returned to her. Mother admitted she did not complete, and was not currently engaged in, substance abuse services. At the time of trial, concerns remained regarding Mother's ability to provide appropriate care for the child due to her reliance on marijuana as a coping mechanism for her stressors given her ongoing mental health issues.

**Anger Management**

{¶ 15} The agency referred Mother for anger management classes following an incident at work where Mother threw a cup of water on a customer, who was holding her baby. During this encounter Mother assumed an "aggressive fighting stance with her fist up towards" the customer. As a result of the incident, Mother was fired from her position, charged with menacing, and convicted of the crime.

{¶ 16} In addition to that incident, there were several occasions during agency meetings and interactions where Mother became verbally aggressive with agency staff, including her case worker.

{¶ 17} Mother completed a six-session anger management program. Foy testified that she did not believe that Mother benefitted from the service because she continued to be aggressive. At a recent visit, Mother wanted to style the child's hair but was not able to finish before the end of the visit. Mother became frustrated and, according to Foy, "was kind of just pushing the child around . . . in an aggressive manner." When Mother brought the child out to Foy's car after the visit, she slammed the car door several times and Foy thought Mother was going to break the car door. Foy testified that this incident occurred after Mother completed the anger management program.

{¶ 18} Mother admitted at trial that she continued her aggressive behavior even after completing the anger management program. Mother claimed she did not have an anger problem, that the anger management classes did not do anything for her, and that since completing the program she did not approach her anger any differently.

**{¶ 19}** The juvenile court noted, on the record, that Mother exhibited inappropriate behavior during trial, including making comments at inappropriate times, throwing her hands up in the air, and storming out of the courtroom.

**Housing and Employment**

**{¶ 20}** Mother found housing during the pendency of the proceedings. Mother was employed but often moved from job to job and told Foy that her income from employment was insufficient to support herself.

**Child's Placement**

**{¶ 21}** Foy testified that the child was residing in a foster home, is well-adjusted, and is bonded with her caregiver. CCDCFS attempted to identify an appropriate relative caregiver for the child but was unable to find kinship placement. Mother attended scheduled biweekly supervised visits with the child, during which Mother was usually "very attentive to the child."

**GAL Recommendation**

**{¶ 22}** At the conclusion of trial, the GAL stated that she recommended the permanent custody be awarded to the agency. The GAL stated that Mother did not seem to have insight as to her mental health and anger and noted that "we all witnessed what I would call an outburst of anger in this courtroom. And I don't know how that would translate into her being able to care for the child." The GAL noted that Mother did not currently have a mental health service provider and did not follow up with recommended after-care subsequent to her hospitalization for a suicide attempt.

{¶ 23} The GAL also noted that "[t]here is no statutory time left for another extension" and that Mother was currently "not in a position to care for this child, which leaves no choice for the Court but to grant the Agency's motion." The GAL stated in her report that she agreed with the agency's concerns about the stability of Mother's mental health and her ability to care for the child on a full-time basis based on her lack of consistent engagement and recent hospitalization.

{¶ 24} Following closing arguments, the trial court took the matter under advisement. On July 23, 2024, the juvenile court entered an order granting permanent custody of the child to CCDCFS.

{¶ 25} Mother filed a timely appeal and raises two assignments of error for our review, which we review out of order for ease of discussion:

> I. The trial court's order granting permanent custody to the agency was not based upon sufficient clear and convincing evidence, was against the manifest weight of the evidence [,] and [the court] erred in finding permanent custody to be in the best interest of the child.
>
> II. The trial court's denial of Mother's request for a continuance was material and in error.

**Law and Analysis**

{¶ 26} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. The right to raise one's own child is "'an essential and basic civil right.'" *In re R.H.*, 2024-Ohio-5009, ¶ 45 (8th Dist.), quoting *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.). This right, however, is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'"

*In re R.H.* at *id.*, quoting *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.). When parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re R.H.* at ¶ 46, citing *In re N.B.*

**Denial of Motion for Continuance**

{¶ 27} In the second assignment of error, Mother argues that the trial court erred in denying her motion to continue the trial date.

{¶ 28} As an initial matter, we note that Mother failed to comply with the appellate rules as to this assignment of error. App.R. 16(A)(7) provides that an appellant's brief shall contain

> [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, *and* parts of the record on which appellant relies. The argument may be preceded by a summary.

(Emphasis added.)

{¶ 29} Appellant properly cited to the record in her appellate brief, but she failed to cite to any authority or statute to support her argument. While we could summarily affirm the assigned error under App.R. 16, we choose to address it because cases are best decided on their merits, especially those involving the termination of parental rights.

{¶ 30} A trial court's decision whether to continue a matter is "'entrusted to the broad, sound discretion of the trial judge.'" *In re Ka.C.*, 2015-Ohio-1158, ¶ 13 (8th Dist.), quoting *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). A court abuses its

discretion "when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 2020-Ohio-6699, ¶ 19; *see also Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35 (describing the "common understanding of what constitutes an abuse of discretion" as "a court exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority").

{¶ 31} When evaluating a continuance request, a court considers: (1) the length of the requested delay; (2) whether the parties have requested and received other continuances; (3) the inconvenience to the parties, witnesses, opposing counsel, and the court; (4) whether the requested delay is for legitimate reasons or is merely dilatory, purposeful, or contrived; (5) whether the movant contributed to the circumstances giving rise to the request for a continuance; and (6) any other relevant factors, depending on the unique circumstances of each case. *Unger* at *id.*

{¶ 32} Here, Mother filed a motion to continue the trial date four days prior to trial. In the motion, Mother argued that the court should continue the trial date because the GAL's report had not yet been filed. In actions to terminate parental rights, "[a]ll reports, written or oral, shall be used by the court to ensure that the guardian ad litem has performed those responsibilities required by section 2151.281 of the Revised Code." Sup.R. 48(F)(1)(a). Unless waived by all parties or the due date is extended by the court, the GAL's final report in a permanent custody proceeding shall be filed with the court and made available to the parties "no less than seven days before the dispositional hearing." Sup.R. 48(F)(1)(a); *see also*

Juv.Loc.R. 18. The GAL filed her report on the day of trial; it is undisputed that the GAL's report was untimely filed.

{¶ 33} In *In re M.S.*, 2015-Ohio-1847 (8th Dist.), the appellant argued that the trial court erred in proceeding with the permanent custody hearing because the GAL report was filed only four days prior to trial and contained the wrong case number. *Id.* at ¶ 32. This court considered whether the appellant was prejudiced by the untimely filing and typographical error and found that there was nothing in the record to suggest prejudice. *Id.* at ¶ 38. This court reasoned that although appellant claimed he lacked adequate time to prepare for cross-examination of the GAL, he failed to identify any new or surprising information in the GAL's report that he was not fully prepared to address at trial. *Id.* This court further noted that appellant had the opportunity to review the report before the hearing, an opportunity to cross-examine the GAL, and the trial court granted appellant leave to make a motion to continue the proceedings to a second hearing date if he found something surprising in the GAL's report or testimony as the hearing progressed. *Id.*

{¶ 34} Likewise, here, there is nothing to suggest that Mother was prejudiced by the delay in the filing of the GAL's report. The record reflects that juvenile court addressed Mother's motion to continue on the record prior to trial. Mother's counsel reiterated the basis of the motion and communicated his concern that the GAL had not observed an interaction between Mother and the child. The GAL told the court that she was not concerned about the interaction between Mother and the child, that the information she relied upon included reports that Mother was both

"very attentive" and "very caring" for the child during visits, and that her lack of an in-person observation did not impact her recommendation.

{¶ 35} The juvenile court denied the motion, noting that Mother's counsel conceded that the GAL report did not raise any new or surprising issues and that the GAL would be subject to cross-examination. The court also stated that it would entertain another request for a continuance should anything new or surprising come out as the case progressed and the court would determine if the GAL needed to observe a visit with Mother and the child.

{¶ 36} Following witness testimony, the court inquired if Mother's counsel needed time before hearing the GAL's oral recommendation. Counsel declined the offer. In light of the above, Mother has not shown that she was prejudiced from the GAL's delay in filing her report and the trial court did not abuse its discretion in denying the motion for continuance.[2]

{¶ 37} The second assignment of error is overruled.

**Standard of Review**

{¶ 38} An appellate court reviews a juvenile court's decision regarding a motion for permanent custody of a child to a children's services agency on sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence grounds. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. In her first assignment of error, Mother maintains that

---

[2] Although we find that the appellant in this case was not prejudiced by the untimely filing of the GAL report, best practices dictate that a GAL should file the report within the time frame set forth in the rules of superintendence and the local rules of the juvenile court.

the juvenile court's decision was both supported by insufficient evidence and against the manifest weight of the evidence.

{¶ 39} "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when 'the evidence is legally sufficient to support the jury verdict as a matter of law.'" *In re Z.C.* at ¶ 13, quoting *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3. A trial court's judgment may be sustained by sufficient evidence, but an "'appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re Z.C.* at ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12. In reviewing a juvenile court's decision regarding permanent custody on weight-of-the-evidence grounds,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.* at *id.*, citing *Eastley*.

{¶ 40} Under R.C. 2151.414, clear and convincing evidence is the standard of proof to be used by a juvenile court in determining whether the statutory requirements for permanent custody are met. Clear and convincing evidence is defined as

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986).

### R.C. 2151.414 Factors

{¶ 41} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). The first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, certain statutory factors. As it applies to this case, the court found that the child could not or should be placed with either parent within a reasonable time (R.C. 2151.414(B)(1)(a)) and the child had been in the temporary custody of one or more public children's services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)). "Only one of the factors must be present to satisfy the first prong of the two-part analysis for granting permanent custody to an agency." *In re D.H.*, 2021-Ohio-3821, ¶ 27 (8th Dist.), citing *In re L.W.*, 2017-Ohio-657, ¶ 28 (8th Dist.).

{¶ 42} Pursuant to R.C. 2151.414(B)(1)(d), the court found that the child had been in agency custody "for twelve or more months of a consecutive twenty-two-month period." Mother does not contest this finding, and the court's determination is supported by the trial record, which demonstrates that the child was placed in agency custody on April 6, 2022, was adjudicated and ordered placed in temporary custody of the agency on July 18, 2022, and CCDCFS filed its motion for permanent

custody motion on March 26, 2024.[3] As such, the "12 of 22 months" finding satisfied the first prong of the permanent custody statute, and the trial court thereafter needed only address the child's best interest pursuant to R.C. 2151.414(D).

{¶ 43} Although not required for the first prong of the permanent custody statute given the "12 of 22 months" finding, the trial court also made the finding that the child could not or should not be placed with one of the child's parents within a reasonable time pursuant to R.C. 2151.414(B)(1)(a). R.C. 2151.414(E) enumerates 15 factors for the court to consider in making a finding under (B)(1)(a). *In re D.G.*, 2023-Ohio-4427, ¶ 24 (8th Dist.). The juvenile court found that the following R.C. 2151.414(E) factors were evident by clear and convincing evidence as to Mother: (1) failure to remedy (R.C. 2151.414(E)(1)); (2) chronic chemical dependency/mental illness (R.C. 2151.414(E)(2)); (3) lack of commitment (R.C. 2151.414(E)(4)); and (4) other relevant factors (R.C. 2151.414(E)(16)).

{¶ 44} Regarding failure to remedy, the juvenile court found that Mother was recommended for intensive outpatient treatment to address her substance abuse issues but did not complete the service. The court also found that Mother failed to consistently address her mental health and control her anger.

{¶ 45} Mother claims that the trial court erred in determining that she had failed to remedy the conditions that led to removal of the child. As evidence to

---

[3] R.C. 2151.414(B)(1) states: "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

support that claim, Mother points to the fact that the agency requested two extensions of temporary custody and filed a motion to terminate temporary custody two months before filing its motion for permanent custody. Thus, according to Mother, the agency conceded that it was in the child's best interest to extend or terminate temporary custody because Mother had made substantial progress on the case plan and there was reasonable cause to believe that the child would be reunified with Mother.

{¶ 46} In determining whether the child could not be placed with either parent within a reasonable time or should not be placed with the parents, the juvenile court is required to consider all relevant evidence. *In re B.T.*, 2017-Ohio-7454, ¶ 23 (11th Dist.), citing *In re Foust*, 57 Ohio App.3d 149, 154 (3d Dist. 1989). This includes facts relating to the adequacy of parental care occurring both before and after the motion for permanent custody is filed. *In re B.T.* at *id.,* citing *In re Foust*. And "although a trial court might distinguish a parent's efforts before the permanent custody motion was filed and after, it is reversible error to limit the evidence and refuse to consider probative factual matters occurring after the filing of the motion." *Pack v. Pack Andrews*, 1992 Ohio App. LEXIS 4342, at *7 (9th Dist.1992), citing *In re Foust*.

{¶ 47} Thus, the juvenile court was not concerned only with Mother's actions up until the motion for permanent custody was filed. The court also had to take into consideration Mother's actions since the agency filed for permanent custody. Although it is undisputed that the agency, at one point, moved to terminate

temporary custody, that motion was withdrawn due to Mother's aggressive behavior and pending criminal case and the agency proceeded to move for permanent custody. The agency could present, and the juvenile court could consider, Mother's actions occurring after the filing of a motion for permanent custody when deciding whether to grant permanent custody even if the motion was initially filed based on prior actions. Likewise, if Mother had demonstrated significant positive changes in her behavior after the initial motion, she could have presented evidence at the hearing to support her case for continued parental rights. Thus, although Mother had completed portions of her case plan, the evidence supported a finding that she did not complete many requirements of her case plan and/or did not benefit from the services.

{¶ 48} As to Mother's chronic chemical dependence, Mother had been diagnosed with a substance use disorder and was recommended services, but she did not complete those services, was not engaged in any substance abuse services at the time of trial, and had recently tested positive for marijuana.

{¶ 49} Regarding Mother's mental health, CCDCFS first became involved with the family in April 2022 after Mother was hospitalized and expressed suicidal ideations as well as thoughts of harming the child. Mother admitted at trial that she was not currently engaged with a mental health provider. Regarding her recent hospitalization for attempted suicide, Mother testified that "I just decided one day I didn't want to live no more, so I took a bottle of pills. And that's that." Mother failed

to attend or reschedule her psychiatric evaluation appointment following the hospitalization and quit seeing her provider at CommQuest soon thereafter.

{¶ 50} Mother acknowledged that she had been diagnosed with anxiety and depression but unilaterally stopped taking her mental health medication "some time last year." Mother admitted at trial that she was not currently engaged with any mental health provider and not receiving any counseling. Although Mother claimed to be on a new medication for her mental health, she was unable to provide any details regarding the medication.

{¶ 51} Mother completed an anger management program but did not show that she benefitted from the program. Mother testified that she did not think she had an anger problem before she engaged in the program, did not think the program helped her, and did not change her approach to her anger since completing the program. The juvenile court saw Mother's lack of control of her emotions firsthand when Mother made comments and stormed out of the courtroom in anger during trial. When giving her oral recommendation, the GAL noted Mother did not seem to have insight as to her mental health and anger.

{¶ 52} The trial court also found that Mother demonstrated a lack of commitment to the child by failing to take the necessary steps to achieve reunification. Although Mother had adequate housing and was employed as of the time of trial, Mother had not successfully completed and benefitted from other case plan services.

{¶ 53} Finally, as to other relevant factors, the trial court noted Mother's recent hospitalization due to her mental health problems, that Mother did not follow up with aftercare upon release from the hospital, and Mother was involved in a violent incident at work.

{¶ 54} On this record, CCDCFS presented clear and convincing evidence that that R.C. 2151.414(B)(1)(d) and 2151.414(B)(1)(a) applied to Mother.

**Best Interest of the Child**

{¶ 55} Next, the juvenile court weighed all relevant best-interest factors set forth under R.C. 2151.414(D)(1) and found the factors under R.C. 2151.414(D)(2) also applied. Under subsection (D)(1), in determining the best interest of a child in a permanent-custody hearing a juvenile court is to consider all relevant factors, including, but not limited to, the factors specifically listed under that subsection. Under subsection (D)(2), a court is required to grant permanent custody to the agency if it finds all of the factors set forth thereunder apply. Like consideration of the R.C. 2151.414(B)(1)(a) factors, the issue of best interest of the child "looks far beyond the date of the filing of the complaint for permanent custody." *In re Foust*, 57 Ohio App.3d at 154. Mother's conduct from that date of filing the complaint for permanent custody to the time of trial is admissible when considering the best interest of the child. *Id.*

{¶ 56} Although a trial court is required to consider each of the R.C. 2151.414(D)(1) factors in making its permanent-custody determination, "there is not one element that is given greater weight than the others pursuant to the

statute." *In re Y.F.*, 2024-Ohio-5604, ¶ 37 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Moreover, only one of the R.C. 2151.414(D)(1) factors need be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re Y.F.* at *id.*, citing *In re S.C.*, 2015-Ohio-2410 (8th Dist.). Pursuant to R.C. 2151.414(D)(2), if all factors are resolved in favor of permanent custody, then the court is required to grant permanent custody to the agency. *In re Y.F.* at ¶ 18. After review, we agree with the juvenile court's finding that all of the best-interest factors were implicated in this case and were supported by clear and convincing evidence in the record.

{¶ 57} Under R.C. 2151.414(D)(1)(a), which considers the interaction and interrelationship with significant persons in the child's life, the court recognized that the child had a bond with Mother but also had been in her current foster home for over a year and was bonded with her foster mother.

{¶ 58} Under R.C. 2151.414(D)(1)(b), which considers the child's wishes as expressed by the child or the child's GAL, the court found that the child was too young to express her wishes but that the GAL believed permanent custody was in the child's best interest.

{¶ 59} Considering the child's custodial history under R.C. 2151.414(D)(1)(c), the record shows that the child was placed in CCDCFS's care when she was four months old and has continuously remained in the agency's custody. Thus, the child had been in agency custody for over two years.

{¶ 60} Under R.C. 2151.414(D)(1)(d), which considers a child's need for a legally secure placement and whether that can be achieved without a grant of permanent custody, the child could no longer be maintained in temporary custody as of July 2024 when the trial court issued its judgment. *See* R.C. 2151.415(D)(4) ("[T]he court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have previously been ordered . . . .").

{¶ 61} The trial court also considered R.C. 2151.414(D)(2) and found that all the factors applied; upon review, we agree. The juvenile court found as follows:

> That court determines by clear and convincing evidence that one or more of the factors in division (E) of [section 2151.414 of the Revised Code] exist and the child cannot be placed with one of the child's parents within a reasonable period of time or should not be placed with either parent.

> The child has been in the agency's custody for two years and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Ohio Revised Code.

> The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of section 2151.353 of the Revised Code.

> Prior to the dispositional hearing, no relative or other interested person has filed or has been identified in a motion for legal custody of the child.

{¶ 62} The trial court did not err in finding that, based on R.C. 2151.414(D)(1) and (D)(2), that permanent custody was in the child's best interest. Moreover, because all the factors under R.C. 2151.414(D)(2) apply, permanent custody was necessarily in the best interest of the child and the juvenile

court was required to grant permanent custody to CCDCFS. *In re P.J.*, 2021-Ohio-1821, ¶ 26 (8th Dist.).

{¶ 63} Accordingly, the first assignment of error is overruled.

**Conclusion**

{¶ 64} Upon review, we conclude that the juvenile court's findings were supported by sufficient evidence in the record and were not against the manifest weight of the evidence and that a grant of permanent custody to CCDCFS was in the best interest of the child.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

MARY J. BOYLE, P.J., and
ANITA LASTER MAYS, J., CONCUR