[Cite as *In re T.W.*, 2017-Ohio-8268.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| T.W. | : | CASE NO. CA2017-06-079 |
| | : | O P I N I O N<br>10/23/2017 |
| | : | |
| | : | |


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 16-D000024


Andrew G. Ostrowski, 20 South Main Street, Springboro, Ohio 45066, guardian ad litem and attorney for child

Eric V. Robinson, 24 Remick Blvd., Springboro, Ohio 45066, for appellant, T.G.

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services

Maxwell D. Kinman, 423 Reading Road, Mason, Ohio 45040, for appellee, CASA


**HENDRICKSON, P.J.**

{¶ 1} The mother of T.W. ("Mother") appeals a decision of the Warren County Court of Common Pleas, Juvenile Division, denying Mother's motion for a six-month extension of temporary custody and granting permanent custody of T.W. to appellee, Warren County Children Services ("WCCS").

**{¶ 2}** On February 17, 2016, WCCS filed a complaint alleging neglect, abuse, and dependency. On the same date, the juvenile court conducted an emergency shelter care hearing and placed T.W. in the temporary custody of WCCS. On March 23, 2016, the juvenile court adjudicated T.W. neglected and dependent. On April 28, 2016, following a dispositional hearing, the juvenile court ordered that T.W. remain in the temporary custody of WCCS. WCCS moved for permanent custody on February 14, 2017 and Mother filed a motion to extend temporary custody on March 20, 2017. The juvenile court held a hearing on the motions on May 8, 2017 and heard testimony from the three caseworkers assigned to this case throughout its pendency.

**{¶ 3}** Collectively, the testimony revealed that this case began on November 22, 2015 when Mother gave birth to T.W., who tested positive for cocaine. The hospital diagnosed T.W. with failure to thrive in addition to detailing several other medical concerns, including rigid muscles, inability to sit up and support his head, and trouble eating and swallowing. Later in the case, doctors further diagnosed T.W. as suffering from a Chiari malformation of the brain and possibly afflicted with a cancerous lesion in his brain. T.W.'s afflictions have further prevented his development and will require at least weekly medical and therapy appointments moving forward. T.W. will later undergo brain surgery.

**{¶ 4}** Mother voluntarily began working with WCCS under an in-home safety plan following T.W.'s birth and developed a case plan for Mother. WCCS later amended this case plan following the dispositional hearing to include the first putative father. WCCS later removed this putative father from the case plan after genetic testing indicated he was not T.W.'s biological father. Mother's case plan included completing drug and alcohol and mental health assessments and following any recommendations therefrom, demonstrating financial stability to WCCS, meeting with WCCS monthly and signing any requested releases, and submitting to random drug screenings.

{¶ 5} Beginning in January 2016, Mother voluntarily participated in her case plan services by meeting with her caseworker, submitting negative drug screens, and engaging in an inpatient drug and alcohol treatment program at First Step. Mother completed the first phase of the program, but failed to complete the aftercare phase.

{¶ 6} In February 2016, Mother failed to appear for multiple visits, could not be contacted, and T.W. missed a medical appointment, which collectively, prompted the caseworker to search for Mother. A relative of Mother communicated to the caseworker that Mother and T.W. were in Tennessee with one of Mother's relatives. The Tennessee Department of Children Services located the relative, but not Mother or T.W. The relative informed the Tennessee agency that Mother never left Ohio and was hiding from WCCS. In turn, police executed a search warrant at Mother's last known location in Ohio. Police located and removed T.W. and placed the child in the temporary custody of WCCS, and as discussed above, emergency shelter care, adjudication, and dispositional hearings before the juvenile court followed in the next few months.

{¶ 7} From February to March 2016, Mother attended an intensive outpatient drug and alcohol program at Solutions. However, she left the program before completing it because of a personal dispute with another program attendee. In April 2016, Mother submitted random drug screens that tested positive for cocaine and marijuana. WCCS referred her to another drug and alcohol program at Talbert House in May 2016. Mother completed the initial assessment and Talbert House recommended standard outpatient weekly drug and alcohol and mental health counseling. Mother completed the drug and alcohol portion of the program, but failed to complete the mental health portion; therefore, Talbert House discharged her from the program. During this period, Mother began disappearing, failed to attend visits, and refused to disclose details of her current residence to WCCS. Mother did not provide drug screens during these disappearances, but did provide

two negative screens in July 2016 and one in November 2016

{¶ 8}  In December 2016, Mother tested positive for cocaine.  The following month, Mother provided another positive test for cocaine and began another treatment program at Access Counseling.  Mother attended a few sessions, but her involvement with the program did not extend into January 2017.  On February 15, 2017, Mother gave birth to her second child, who also tested positive for cocaine.  WCCS removed Mother's second child from her care and placed the child in a foster home.  Shortly thereafter, Mother reengaged in drug and alcohol and mental health counseling.  As the case proceeded, WCCS moved T.W. to a second foster home because the original home was unable to meet his long-term medical needs.  Due to the extensiveness of T.W.'s medical needs, WCCS amended the original case plan a third time to require Mother to attend parenting classes and T.W.'s medical appointments.

{¶ 9}  Mother informed the caseworker of a second putative father.  Initially, WCCS was unable to contact this individual.  However, WCCS made contact with him after Mother informed the agency of the availability of his contact information through the sex offender registry, as he is registered sex offender.  The second putative father indicated to WCCS that there was "no way" he was the father and that he "wanted nothing to do with it."  He further indicated that he had no interest in working towards reunification and refused to work with WCCS because he was certain he was not the father.

{¶ 10}  At the time of the permanent custody hearing, Mother had failed to complete any of her case plan objectives.  Mother did not provide verification of stable housing or employment, failed to attend parenting classes and group sessions for those having children with developmental disabilities, and only attended two medical appointments from June 2016 to November 2016. The last time Mother saw T.W. was on August 17, 2016 because she stopped attending visits.  Mother's disappearance included no communication with T.W. for

more than 90 days. T.W.'s current placement is in a foster-to-adopt home that has additional adoptive and foster children, including T.W.'s younger brother.

{¶ 11} Following the conclusion of the trial, the juvenile court denied Mother's motion to extend temporary custody and granted WCCS permanent custody. The present appeal followed.

{¶ 12} Assignment of Error No. 1:

{¶ 13} APPELLANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 14} Mother contends that absent her trial counsel's failure to file a motion for paternity testing of the second putative father, the juvenile court would have granted her motion to extend temporary custody because additional options for placement with the putative father's family would have likely been discovered.

{¶ 15} Typically, a claim for ineffective assistance of trial counsel is not a proper ground on which to reverse the judgment of a lower court in a civil case that does not result in incarceration in its application. *Rafeld v. Sours*, 5th Dist. Ashland No. 14 COA 006, 2014-Ohio-4242, ¶ 15. However, there is an exception for such claims in civil permanent custody appeals. *In re Tyas*, 12th Dist. Clinton No. CA2002-02-010, 2002-Ohio-6679, ¶ 4.

{¶ 16} To prevail on an ineffective assistance of counsel claim, an appellant must establish (1) that his trial counsel's performance was deficient, and (2) that such deficiency prejudiced the defense to the point of depriving the appellant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984); *State v. Ullman*, 12th Dist. Warren No. CA2002-10-110, 2003-Ohio-4003, ¶ 43. Trial counsel's performance will not be deemed deficient unless it "fell below an objective standard of reasonableness." *Strickland* at 688. To show prejudice, a defendant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *State v. Wilson*, 12th Dist. Madison No. CA2013-10-034, 2014-Ohio-2342, ¶ 17. A defendant's failure to satisfy one part of the *Strickland* test negates a court's need to consider the other. *State v. Hurst*, 12th Dist. Brown No. CA2014-02-004, 2014-Ohio-4890, ¶ 7.

{¶ 17} Contrary to Mother's claim otherwise, her trial counsel's decision to not move the court for an order to have the second putative father submit to genetic testing to determine paternity was neither deficient nor prejudiced Mother. There is no guarantee that genetic testing would have identified the second putative father as T.W.'s biological father. Mother's first supposition of T.W.'s biological father was incorrect. Additionally, Mother's contention that such testing would have extended the case to allow more options for placement is misguided because it relies on assumptions that the second putative father was in fact T.W.'s biological father, that someone in his family would have been interested in placement, and could provide a suitable placement that could meet T.W.'s extensive medical needs. Moreover, although a paternity action could have forced the second putative father to submit to genetic testing, it would not have forced him to participate in the case and observe his role as father. Even assuming Mother's second guess as to T.W.'s father was correct, the second putative father expressly refused to participate in the case. Thus, Mother's desire to delay the granting of permanent custody for genetic testing is contrary to T.W.'s interest in achieving permanence and the policy embodied in the child protective services statutes that these cases be resolved expeditiously to achieve permanence. Therefore, Mother's trial counsel was not ineffective for not moving for genetic testing of the second putative father.

{¶ 18} Accordingly, Mother's first assignment of error is overruled.

{¶ 19} Assignment of Error No. 2:

{¶ 20} THE JUVENILE COURT ERRED BY DENYING APPELLANT'S REQUEST FOR CONTINUANCE.

{¶ 21}  Mother contends the juvenile court erred in denying her motion for a six-month extension of temporary custody because paternity testing of the putative father would not have significantly delayed resolution of the case and any inconvenience to the parties, witnesses, and juvenile court would have been minimal.

{¶ 22}  We note Mother's assignment of error argues interchangeably that the juvenile court erred by denying her motion as a motion to extend temporary custody and a motion for a continuance.  However, the motion before the juvenile court only requested a six-month extension of temporary custody pursuant to R.C. 2151.415(D)(1).  After thoroughly reviewing the record, it is evident Mother did not request a continuance pursuant to Juv.R. 23.  For ease of discussion, we will first distinguish the differing standards between the two requests.

{¶ 23}  The decision whether to grant or deny a motion for a continuance is left to the juvenile court's sound discretion.  *In re E.W.*, 12th Dist. Warren Nos. CA2017-01-001, CA201701-002, and CA2017-01-003, 2017-Ohio-7215, ¶ 21.  Pursuant to Juv.R. 23, "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties."  In making such determination, the juvenile court should consider the length of the delay requested, the inconvenience to other litigants, witnesses, opposing counsel, and the juvenile court, whether the requested delay is for a legitimate reason or dilatory and contrived, whether the requesting party contributed to the circumstances giving rise to the request, and any other factor relevant to the particular facts and circumstances of the case. *In re E.W.* at ¶ 21.

{¶ 24}  Pursuant to R.C. 2151.415(D) and Juv.R. 14, a juvenile court may extend a temporary custody order for a period up to six months, if it determines by clear and convincing evidence that the extension (1) is in the best interest of the child, (2) there has been significant progress on the case plan of the child, and (3) there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently

- 7 -

placed within the period of extension. *See In re H.G.*, 12th Dist. Clinton No. CA2014-11-014, 2015-Ohio-1764, ¶ 19. Hence, although Mother's argument frames a request for a continuance and a request for an extension interchangeably, the standard for the juvenile court to apply in determining whether to grant or deny such requests differs. In turn, Mother brought her motion pursuant to R.C. 2151.415(D) and Juv.R. 14; therefore, we construe Mother's assignment of error under the extension framework.

{¶ 25} "Notably, the [extension] statute provides only that the juvenile court *may* extend the temporary custody order, not that it *must* do so." *Id.* at ¶ 20. Therefore, such decision is subject to review under an abuse of discretion standard. *Id.* An abuse of discretion is more than an error of law or judgment. Rather, it suggests the "trial court's decision was unreasonable, arbitrary or unconscionable." *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8. "A review under the abuse-of-discretion standard is a deferential review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14.

{¶ 26} After thoroughly reviewing the record, we find the juvenile court did not abuse its discretion in denying Mother's motion for an extension of temporary custody. At the time of the hearing, Mother had been involved with WCCS for fifteen months and failed to make any progress within her case plan. Mother had yet to fully complete one case plan objective, disappeared for extended periods, and provided multiple failed drug screens. *In re E.F.*, 12th Dist. Clinton Nos. CA2016-03-003 thru CA2016-03-007, 2016-Ohio-7265, ¶ 36 (stating a juvenile court "is not required to deny [a] permanent custody motion simply based upon the groundless speculation that the [parents] might successfully complete [their] drug treatment, * * * and remain drug-free"), citing *In re J.C.*, 4th Dist. Adams No. 07CA834, 2007-Ohio-3783, ¶ 25.

{¶ 27} Mother contends the extension would have provided additional time for genetic testing to determine the biological father of T.W. and possibly provide additional placement

options with the second putative father's family. However, as discussed above, the second putative father clearly expressed his disinterest with participating in the case and that he was positive he was not T.W.'s father. The record does not readily indicate family members of the second putative father interested in placement. Nor does it indicate that any such hypothetical family members could provide a suitable placement. Rather, Mother speculates that if genetic testing determines the second putative father is in fact T.W.'s biological father, then he must have family to consider for possible placement. Mother's speculation about the second putative father's family and her lack of case plan progress support the juvenile court's determination that an extension does not provide reasonable cause to believe T.W. could be reunified with his parents or otherwise permanently placed.

{¶ 28} Mother's speculation asked the juvenile court to put T.W.'s welfare on hold to provide an additional six months to determine if her second guess at T.W.'s biological father holds true. T.W. is afflicted with serious medical conditions and will require extensive care to treat these conditions in the future. T.W. needs to know whom he may rely upon for his care and nurture and with his certain health challenges, the only way to achieve this is by a stable, permanent, and healthy, home environment. T.W.'s current placement is with a foster-to-adopt family alongside his younger brother, and the family has indicated an interest in adoption.

{¶ 29} Moreover, Mother does not contest the factual basis supporting the juvenile court's decision granting permanent custody. *In re H.G.*, 12th Dist. Clinton No. CA2014-11-014, 2015-Ohio-1764, ¶ 24 ("juvenile court's finding that a grant of permanent custody to [children's agency] was in [child's] best interest necessarily implied that an extension of temporary custody was not"); *see also In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 31-38 (holding a grant of permanent custody is in a child's best interest where a parent fails to make any progress in his or her case plan and fails to remain drug free).

Therefore, the juvenile court's decision to deny Mother's motion for an extension of temporary custody did not constitute an abuse of discretion.

{¶ 30} Accordingly, Mother's second assignment of error is overruled.

{¶ 31} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.