[Cite as *In re A.N.*, 2026-Ohio-939.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

IN RE A.N., ET AL.                                :

                                                  No. 115692

A Minor Child                                     :

[Appeal by Mother, A.C.]                          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 19, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD24903913 and AD24903914

---

***Appearances:***

Caitlin E. Monter, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

TIMOTHY W. CLARY, J.:

{¶ 1} Appellant-mother, A.C. ("Mother"), appeals from the juvenile court's judgment granting permanent custody of her minor children, A.N. and D.N., to appellee, Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Mother raises the following assignment of error for review:

1. The trial court erred by granting permanent custody of appellant's children to the agency against the sufficiency and manifest weight of the evidence.

2. The trial court erred by granting permanent custody of appellant's children over the motion for extension of temporary custody.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} Mother and D.N. ("Father") are the biological parents of A.N. (d.o.b. June 8, 2022) and D.N. (d.o.b. June 8, 2022). On April 23, 2024, CCDCFS filed a complaint for temporary custody, alleging that A.N. and D.N. were neglected and dependent children as defined in R.C. 2151.03(A)(2) and 2151.04(B).[1] Following a hearing held the same day, the children were committed to the emergency custody of the agency.

{¶ 4} On July 16, 2024, Mother appeared before the juvenile court and stipulated to the allegations of an amended complaint that set forth the following particulars:

1. On or about April 17, 2024, Mother became overwhelmed with the care of her children and dropped them off at Maternal Grandmother's house.

2. Mother needs additional support to provide for the children's basic needs.

3. Mother needs to address mental health concerns to provide safe and appropriate care of the children.

---

[1] The agency's complaint was filed against Mother as well as the children's biological father. The biological father is not a party to this appeal.

4. Mother needs to address substance use concerns to provide safe and appropriate care of the children.

At the conclusion of the hearing, the children were adjudicated dependent and were placed in the temporary custody of CCDCFS. The trial court further approved a case plan for reunification that was developed to address the agency's concerns with Mother's mental health, substance abuse, parenting, and housing.

{¶ 5} On February 18, 2025, CCDCFS filed a motion to modify the orders of temporary custody to orders of permanent custody pursuant to R.C. 2151.413. The motion was supported by the affidavit of CCDCFS social worker, Marsherie Dandridge ("Dandridge"), who averred, in pertinent part:

5. A case plan was filed with the Juvenile Court and approved which required that the children's mother, [A.C.]: complete a psychological evaluation, comply with all recommendations, sign a release of information as requested, complete a drug/alcohol assessment, comply with any/all treatment recommendations, submit to random drug screens as requested, sign a release of information as requested; successfully complete a parenting education program and demonstrate a benefit therefrom.

6. Despite reasonable case planning and diligent efforts by CCDCFS to assist her in working toward reunification, Mother has failed consistently and repeatedly to substantially remedy the conditions causing the children to be removed from her care a second time. Mother has failed to fully and consistently engage in case plan services or to demonstrate benefit by reducing the risks associated with the children's removal. Mother left her substance abuse treatment program in mid-November of 2024 and has not been heard from of locatable by CCDCFS staff since that time.

7. Mother has demonstrated a lack of commitment to the children by failing to fully engage in services in an attempt to achieve reunification with the children, and by failing to regularly visit with them. She has been evasive with the agency since November 2024 and has not visited the children since December 5, 2024.

{¶ 6} On August 4, 2025, Mother filed a motion "for first extension of temporary custody to CCDCFS" pursuant to R.C. 2151.353. Mother argued that an extension of temporary custody was appropriate and in the best interests of the children because she was engaging in case-plan services and "there is reasonable cause to believe that the children may be reunited with Mother within the period of extension." Mother stated that she voluntarily enrolled herself into a residential treatment facility in April 2025, and has been actively working to address the issues that caused the children to be removed from her care — "she simply needs more time to complete case plan services."

{¶ 7} On August 11, 2025, the juvenile court held a hearing to resolve the pending motions. On behalf of the agency, Dandridge testified that she is employed as an extended caseworker with CCDCFS and was assigned to the children's case in May 2024. Dandridge outlined Mother's history with the agency and explained the circumstances that caused the children to be removed from Mother's care. In pertinent part, Dandridge testified that the agency sought emergency temporary custody of the children after Mother left the children with their maternal grandmother, at which time she had unresolved issues with substance abuse and mental health. Mother reported that she was overwhelmed with childcare and left the children at the maternal grandmother's home without providing the maternal grandmother with sufficient contact information.

{¶ 8} Dandridge testified that a case plan for reunification was developed to assist Mother in addressing the issues that led to the children's removal. As

mentioned, Mother's case plan included components relating to the agency's concerns with Mother's mental health, substance-abuse issues, parenting, and stable housing. In pertinent part, the case plan required Mother to (1) complete a psychological examination, engage with any recommended services, and take prescribed medications; (2) complete a drug and alcohol assessment, successfully complete any recommended treatments, submit to random drug screens, and sign a release of information; and (3) successfully complete a parenting-education program and attend visits with the support of a parenting coach.

{¶ 9} Mental-health components were included in Mother's case plan based on the agency's concerns with Mother's reported diagnoses for post-traumatic stress disorder ("PTSD"), bipolar disorder, and anxiety. (R. 72; CCDCFS Trial Ex. No. 7.) Mother also reported a history of depression and confirmed that she had not taken prescribed medication since she was 18 years old. (*Id.*) Dandridge testified that Mother initially engaged in mental-health services through the nonprofit organization, FrontLine Services, where she was required to participate in group therapy and individualized counseling. Ultimately, however, Mother "disengaged with FrontLine" and failed to complete her mental-health programming. (Tr. 42.)

{¶ 10} Regarding the substance-abuse component of the case plan, Dandridge testified that Mother was required to complete a substance-abuse assessment because of her stated struggles with drug use that dated back to 2015. Mother was initially referred to Stella Maris, a Cleveland based drug and alcohol treatment center, for a substance-abuse assessment in July 2024. Mother was

diagnosed with "severe" substance-use disorders relating to her historical use of amphetamines, cocaine, and cannabis. (CCDCFS Trial Ex. No. 7.) In September 2024, Mother was admitted into an intensive inpatient monitoring at Stella Maris "for chemical detox from alcohol and cocaine" because of continued drug use. (*Id.*) She subsequently participated in a partial hospitalization program and an intensive outpatient program at Stella Maris.

{¶ 11} In December 2024, Mother was "unsuccessfully discharged" from Stella Maris after she left the facility on a weekend pass and failed to return. Following her discharge, Mother remained disengaged with CCDCFS for approximately six months. Dandridge testified that she was only able to contact Mother on one occasion during this six-month period. During this conversation, Mother stated that "she was at risk for eviction." (Tr. 48.) "After that point, [Dandridge] didn't have any more connection with [Mother]" for several months. (Tr. 48.)

{¶ 12} In May 2025, Mother informed Dandridge that she had voluntarily entered a treatment program with Alliant Treatment Center after relapsing with cocaine. (Tr. 48-49.) At the time of trial, Mother was still enrolled at Alliant and had not completed the recommended treatment program. Dandridge was not provided official records from Alliant to validate Mother's progress but did receive email correspondences regarding Mother's treatment. The email correspondences describe Mother's participation in drug screens, parenting classes, mental-health counseling, and her medication compliance. (Tr. 69-70.) Mother signed a release

of information permitting the agency to obtain official records from Alliant; however, Dandridge was unable to obtain the records prior to the permanent custody hearing despite her efforts. (Tr. 65, 76-77.) Accordingly, Dandridge opined that Mother did not successfully complete her case-plan objectives for substance abuse because Mother had yet to complete her substance-abuse program and the agency had not received official documentation from Alliant regarding Mother's progress. (Tr.51, 75-77.)

{¶ 13} Stable and appropriate housing also remained a concern for the agency. As mentioned, Mother was residing at Stella Maris until she failed to return to the facility in December 2024. Sometime between February and March 2025, Mother was evicted from her subsequent residence. (Tr. 59, 74.) CCDCFS then referred Mother to the Lakewood Collaborative for housing assistance; however, Mother failed to make herself available for available services. (Tr. 75.) At the time of trial, Mother was residing at the Alliant treatment facility, where she remained in sober supportive housing. If Mother completed the Alliant program, there were services that could assist Mother in her housing search. However, Alliant could not "guarantee placement" in housing. (Tr. 90-91.)

{¶ 14} Dandridge confirmed that Mother completed a parenting education program in June 2024 and consistently attended weekly supervised visits with the children prior to her departure from Stella Maris. During several of these visits, the children demonstrated some behavioral issues and would often fight with one another. Based on Mother's failure to correct the children's behavior, the agency

appointed a parenting coach to assist Mother in developing better parenting techniques. Dandridge confirmed that Mother's interactions with the children improved "slightly" after a parenting coach was appointed. (Tr. 46.) However, the visitations stopped in December 2024 after Mother left the Stella Maris program and was disengaged from the agency. (Tr. 24-25, 47-48.) Mother's absence also terminated the services of the parenting coach. Between December 2024 and June 2025, Mother had no contact with the children. (Tr. 25.) However, once visitation resumed in June 2025, Mother has consistently attended weekly supervised visits with the children at the Alliant facility. Dandridge testified that the children "seem happy" when they see their mother. (Tr. 72.)

{¶ 15} Dandridge also provided extensive testimony concerning the children's current placement in a foster home. Dandridge stated that the children have been in the continuous care of the foster family since April 22, 2024, when the children were just 22-months old. The children "are very attached to the foster mom" and call her "mommy." (Tr. 54.) The children have also developed strong relationships with the foster family's extended family, including grandparents, uncles, aunts, and cousins. Dandridge stated that the foster family is meeting the children's basic needs and has enrolled the children into additional services to minimize behavior issues that were presented at the beginning of the case.

{¶ 16} Regarding the children's biological father, Dandridge testified that Father has established paternity but has had no involvement or visitation with the children since April 2022. Father currently resides in the state of Alabama and did

not respond to the agency's repeated attempts to engage with him during the pendency of this matter. Dandridge further testified that the agency attempted to identify suitable relatives for placement. Their efforts, however, proved unsuccessful.

{¶ 17} Based on the foregoing, Dandridge opined that permanent custody in favor of the agency was in the children's best interests. She explained her position as follows:

> Upon receiving the case, Mom was not compliant — well, she was not making significant progress with any of her case plan services. We did try to put in extra supports for mother with the parenting. We did referrals. She was inconsistent with her mental health. She has relapsed a few times on her substance [abuse]. She did not — the last time I heard from mom prior to that was in her last visit in December of 2024. I was not able to make contact with mom. I went to mom's house several times. I called the last known phone number.

> Mom made contact with me in February [2025]. At that time, she was not connected with services, and she did not get reconnected to service until May [2025]. Due to the insignificant case progress and not seeing the children for a significant amount of time, that is the reason why the agency filed for [permanent custody].

(Tr. 60-61.)

{¶ 18} On behalf of Mother, Sheila Burt ("Burt"), a clinician from Alliant, testified that Mother has been enrolled at Alliant since April 11, 2025. Burt outlined the programs offered at Alliant and described the specific treatment Mother has received during her time at the facility. According to Burt, Mother was living on campus in the facility's "sober supportive housing" and was enrolled in an intensive outpatient treatment program ("IOP"). (Tr. 97.) Mother's treatment includes individual and group counseling that is focused on addressing her substance-abuse

issues, life skills, and mental health. In addition, Mother is participating in weekly parenting classes and is actively volunteering at a food-services program to improve her employment resume and coping skills.

{¶ 19} Mother's initial assessment at Alliant revealed that she was "unable to maintain sobriety in an unsupervised capacity" and needed additional "treatment, support, and resources to become a fit mother." (Tr. 103-105.) Burt stated, however, that Mother was progressing through the program and was actively participating in the treatment services. Mother discussed her desire to "be a fit mother for [the children]" and has expressed remorse for her past mistakes. (Tr. 90.) Burt opined that Mother is "absolutely" motivated to address her mental-health and substance-abuse issues and was likely to successfully complete the IOP. (Tr. 85, 90.) Mother is taking prescribed medication for her mental-health issues and is routinely drug tested at the facility. Burt testified that Mother's urine screens have been "favorable" and that she reported Mother's progress to the agency in an email correspondence dated July 19, 2025. (Tr. 88.) As of the date of trial, Mother was projected to complete the IOP in September 2025. Mother would then be enrolled in an aftercare program that would end in January 2026. Burt testified that once Mother completes her services through Alliant, she would be referred to a transitional housing program to assist her in obtaining suitable housing.

{¶ 20} Finally, the court heard from the child's guardian ad litem, Rebecca Weiss, Esq. (the "GAL"). Consistent with the recommendations of the agency's

employees, the GAL recommended that permanent custody be granted in favor of

CCDCFS. The GAL summarized her position as follows:

> My role is to make recommendations regarding what's in the best interests of the children. These children are too young to express their own wishes. So I can't know that. But I know that they have been with foster mom for almost 16 months from age 22 months to over age 3.

> These are really important years for kids. You know, these are formative years for their development. They need a stable environment, stable housing. They need security. They need routines.

> These children have bonded with foster mom. I've been there twice to their home and seen how they bond with her. They've come a long way in terms of development and their speech and their behavior.

> I commend mom for what she has done. She's doing — she's making good progress at this point. However, I do not believe that these children, within a reasonable amount of time, will be able to be safely placed with mother. I'm concerned about that. I'm concerned because of what's gone on, what I've seen in this case, the relapse, the leaving of Stella Maris, dropping the children off at her mother's home without letting her — without giving her any contact information. So if something happened with those children, she wouldn't have known or if grandmother needed help, she couldn't have called mom.

> She also, you know, [foster parent] lost contact with [Mother] for a period of time, et cetera. And I don't want to repeat everything we've heard, but my recommendation is for permanent custody to the agency.

(Tr. 119-120.) When questioned by Mother's trial counsel, the GAL acknowledged that Mother was making progress towards her case-plan objectives during her enrollment at Alliant. The GAL explained, however, that it was going to take additional time for Mother to complete her programming and that prolonging the children's permanency determination would have negative effects that were not in the children's best interests. Accordingly, the GAL opined that an extension of

temporary custody would not serve the children's need for stability, stating, "I feel [the children] have been in this situation long enough." (Tr. 121-122.)

{¶ 21} On September 16, 2025, the juvenile court issued separate journal entries denying Mother's motion for extension of temporary custody and granting the agency's motion for permanent custody, thereby terminating Mother's parental rights. This timely appeal followed.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 22} In the first assignment of error, Mother argues the juvenile court's judgment granting permanent custody to CCDCFS is not supported by sufficient evidence and is against the manifest weight of the evidence. Mother contends that the juvenile court's decision ignores the substantial progress she has made towards her case plan objectives since April 2025, and failed to adequately consider her relationship with A.N. and D.N. when considering the best interests of the children.

{¶ 23} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or

controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 24} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14; *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994). All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

**1. Standard of Review**

{¶ 25} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned,

but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.  R.C. 2151.414(B)(1)(a)-(e).

{¶ 26} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).  "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'"  *In re Z.C.,* 2023-Ohio-4703*, ¶* 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 27} The Supreme Court of Ohio clarified the standard of review in permanent custody cases, explaining that

> [g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.* at ¶ 11.

{¶ 28} In reviewing the sufficiency challenge herein, we must examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. *See id.* at ¶ 12, citing *Cross* at 477. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 29} Relevant here, the Ohio Supreme Court has emphasized the importance of affording appropriate deference to the finder of fact, stating:

> "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." [*Eastley*] at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining

the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

## 2. First Prong — R.C. 2151.414(B)

{¶ 30} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that the children were neither abandoned nor orphaned, but they could not be placed with either parent within a reasonable time or should not be placed with their parents.

{¶ 31} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.*, 2014-Ohio-5348, ¶ 58 (8th Dist.). A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent. *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.).

{¶ 32} In this case, the juvenile court found the children could not be placed with either parent within a reasonable time or should not be placed with either parent pursuant to the factors outlined in R.C. 2151.414(E)(1), (2), and (10). These provisions provide as follows:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining

whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

. . .

(10) The parent has abandoned the child.

{¶ 33} After careful consideration, we find competent and credible evidence supports the juvenile court's determination that the children clearly and convincingly could not or should not be placed with either parent within a reasonable time.

{¶ 34} In reaching this conclusion, we acknowledge that Mother has voluntarily taken efforts to address her substance-abuse and mental-health issues since the motion for permanent custody was filed in February 2025. Mother enrolled herself into the Alliant treatment facility and has demonstrated a willingness to develop the skills and coping mechanisms needed to maintain her sobriety. The record further reflects that Mother has completed a parenting-education course and resumed visitation with the children during her time at Alliant. Finally, it is evident that Mother has begun planning for her future after she completes the treatment program. Alliant representative, Burt, testified that

Mother began volunteering to improve her employability and has discussed working with housing services to obtain stable housing. Mother's efforts in these areas are to be commended.

{¶ 35} With that stated, however, we find the record equally reflects that Mother failed to complete significant portions of her case plan and, therefore, failed to substantially remedy the conditions that caused the children to be removed from her home. In this case, the children were removed from Mother's care based on the agency's concerns with Mother's questionable parenting decisions and her associated history of substance abuse and mental-health issues. Mother has been diagnosed with "severe" substance-abuse disorders involving the use of cocaine, amphetamines, and cannabis. She has further reported significant mental-health diagnoses and admitted to a history of being noncompliant with her mental-health medication. To address these issues, the agency developed a case plan that expressly required Mother to participate and successfully complete programs relating to her mental health, substance abuse, and parenting skills.

{¶ 36} Upon review, the record confirms Dandridge's testimony that Mother is still progressing through her case-plan objectives for reunification and has yet to successfully complete the substance-abuse and mental-health components of her case plan. Burt estimated that Mother needed an additional five months to complete the treatment program at Alliant and would require additional parenting services after the program ended. (Tr. 84, 107.) There also remain significant concerns with Mother's ability to maintain her sobriety or address her mental-health issues in an

unsupervised capacity. During the pendency of this case, Mother has demonstrated a pattern of drug use when she is not actively enrolled in a supervised treatment program. Following the children's removal in April 2024, Mother continued to use drugs and alcohol until she was admitted into the Stella Maris treatment facility for a medically supervised detox in September 2024. Although Mother later engaged in recommended services, she was unsuccessfully discharged from Stella Maris in December 2024. Again, Mother relapsed on drugs and distanced herself from the agency and her children for approximately six months. Mother is now managing her sobriety and mental health at the Alliant facility. However, Burt conceded that Mother was still working "to become a fit mother" and was historically unable to maintain her sobriety without direct supervision. (Tr. 104-105.) Collectively, these factors support the agency's ongoing concerns with Mother's mental health and her ability to remedy her drug dependency on a long-term basis. *See, e.g., In re M.H.*, 2002-Ohio-2968, ¶ 34 (8th Dist.) ("[E]ven though mother had been drug-free for the six months preceding trial, her erratic history of drug-use and her unsuccessful attempts at so many other drug treatment programs does not leave this court convinced of mother's ability to remedy her drug dependency, on a long-term basis."); *In re D.G.*, 2023-Ohio-4427, ¶28 (8th Dist.) ("In light of mother's long history of substance abuse and relapses, we agree with the trial court that mother's eleventh-hour efforts are not sufficient to demonstrate substantial compliance with the substance-abuse component of her case plan.").

{¶ 37} The record further supports the juvenile court's conclusion that Mother abandoned the children for approximately six months following her discharge from Stella Maris. (Tr. 25, 48-49.) During this period of time, Mother did not consistently interact with the agency and had no visits with the children. R.C. 2151.011(C) (a child is "presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days").

{¶ 38} Finally, the record shows that Mother is unemployed and has not secured stable housing. Mother was evicted from her home in early 2025, and did not have housing of her own at the time of trial. Although Mother was eligible for housing services after she completes the Alliant program in January 2026, the availability of housing and the time required to obtain a safe and stable home was unknown.

{¶ 39} Our independent review confirms that the juvenile court's findings under R.C. 2151.414(E) are supported by the record and the testimony adduced at trial. Accordingly, we find sufficient and credible evidence supports the juvenile court's conclusion that A.N. and D.N. clearly and convincingly could not or should not be placed with either parent within a reasonable time pursuant to R.C. 2151.414(B)(1)(a).

### 3. Second Prong: Best Interests of the Child

{¶ 40} Having determined that competent and credible evidence supports the juvenile court's finding that the child could not or should not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis, which requires the court to determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 41} "In determining the best interest of a child, a juvenile court 'may apply one of two different tests.'" *In re S.C.*, 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.*, 2019-Ohio-1619, ¶ 39 (10th Dist.). "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors . . . to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *Id.*, quoting *In re J.P.* at ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39. "These two provisions 'are alternative means for reaching the best-interest determination.'" *Id.*, quoting *In re J.P.* at ¶ 40.

{¶ 42} In this case, the juvenile court applied R.C. 2151.414(D)(1). The statute requires the juvenile court to consider all relevant factors in determining whether the child's best interests would be served by granting permanent custody. These factors include (a) the interaction and interrelationship of the child with the child's parents; (b) the child's wishes, as expressed directly by the child or through the child's GAL; (c) the child's custodial history; (d) the child's need for a legally

secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1).

{¶ 43} A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent-custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re D.H.*, 2022-Ohio-2780, ¶ 46 (8th Dist.), citing *In re G.W.*, 2019-Ohio-1533, ¶ 72 (8th Dist.). Furthermore, the Ohio Supreme Court has held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 44} After careful consideration of the testimony presented at the permanent custody hearing, we find there is competent, credible evidence in the record to support the juvenile court's reliance on the factors set forth under R.C. 2151.414(D). Moreover, we cannot say that this is the exceptional case where the juvenile court lost its way and created a manifest miscarriage of justice in evaluating the best-interest factors.

{¶ 45} First, with respect to the children's relationship with their parents, siblings, relatives, and foster parents, there is no dispute that the children do not share a relationship with their biological father. The record further reflects that the children have developed a strong bond with the foster mother and her extended

family. The children have remained in the foster mother's continuous and uninterrupted care since they were 22 months old. The children refer to the foster mother as "mom," and their basic needs are being met in their current placement. (Tr. 31.)

{¶ 46} Regarding Mother, trial testimony indicated that Mother participated in supervised visits with the children following their removal in April 2024. During these weekly visits, the children exhibited some "behavior issues" that Mother failed to resolve. (Tr. 45.) Dandridge testified that Mother's interactions with the children improved after a parenting coach was appointed to supervise the visits. However, the visits ended in December 2024, after Mother left Stella Maris and resumed her drug use. Mother's supervised visitation with the children did not resume until June 2025 — approximately six months later. Dandridge testified that the children "seem happy" during the visits with Mother at the Alliant facility. (Tr. 72.) Nevertheless, the agency continued to have concerns about Mother's parenting skills based on her failure to successfully complete case-plan services.

{¶ 47} Under R.C. 2151.414(D)(1)(b), it is proper for the juvenile court to consider the GAL's recommendation where the children are too young to express their wishes. *In re M.D.*, 2022-Ohio-2672, ¶ 35 (8th Dist.). Here, the children were three years old at the time of the permanent custody hearing. Although the children did not formulate a meaningful expression of their wishes at the custody hearing because of their age, the GAL spoke on the children's behalf and recommended permanent custody to CCDCFS. Noting the children's need for stability and

Mother's unresolved substance-abuse and mental-health issues, the GAL believed that permanent custody was in the children's best interests.

{¶ 48} Regarding the (D)(1)(c) and (d) factors, there is no dispute that the agency was unable to identify a suitable relative for placement and that the children have remained in the agency's custody since April 2024. As discussed above, the juvenile court's conclusion that the children could not be placed with a parent within a reasonable time or should not be placed with either parent was supported by findings consistent with R.C. 2151.414(E), any of which mandate that legal conclusion. Mother had approximately 16 months to take the necessary steps to remedy the substantial issues that caused the children to be removed from her care. Although Mother was working to address the issues that have negatively affected her in the past, her history of drug relapses and the timing of her enrollment into Alliant prohibited her from demonstrating her ability to provide the children with a permanent and stable home at the time of trial.

{¶ 49} Finally, R.C. 2151.414(D)(1)(e) requires the court to consider whether any factors under R.C. 2151.414(E)(7) to (11) apply in making its best interest determination. As mentioned, the juvenile court found that the factor listed under R.C. 2151.414(E)(10) was established by clear and convincing evidence based on the trial testimony establishing that Mother failed to visit or maintain contact with the children for more than ninety days.

{¶ 50} Balancing the foregoing factors and the recommendations of the GAL and agency employees, the juvenile court was free to conclude that the ultimate

welfare of the children would be better served by an award of permanent custody. CCDCFS provided credible evidence regarding the children's custodial history, their need for legally secure permanent placement, and the significant hurdles Mother has yet to overcome. Accordingly, we find the juvenile court's award of permanent custody to CCDCFS is supported by sufficient evidence and is not contrary to the manifest weight of the evidence.

{¶ 51} The first assignment of error is overruled.

## B. Motion for Extension of Temporary Custody

{¶ 52} In the second assignment of error, Mother argues the juvenile court abused its discretion by denying her motion for extension of temporary custody. In support of this assigned error, Mother reiterates her previous arguments, stating that "if temporary custody was extended for six additional months," she would have completed her case-plan objectives for reunification.

{¶ 53} Under R.C. 2151.415(D) and Juv.R. 14, a juvenile court may extend a temporary custody order for a period of six months if it determines, by clear and convincing evidence, that the extension (1) is in the best interest of the child, (2) there has been significant progress on the case plan of the child, and (3) there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension. *In re D.H.,* 2025-Ohio-748, ¶ 18 (8th Dist.) "'Notably the [extension] statute provides only that the juvenile court may extend the temporary custody order, not that it must do so.'" *In re T.W.,* 2017-Ohio-8268, ¶ 25 (12th Dist.), quoting *In re H.G.,* 2015-Ohio-1764,

¶ 20 (12th Dist.). A juvenile court's decision to grant or deny a request for an extension of temporary custody is therefore reviewed under an abuse-of-discretion standard. *Id.* An abuse of discretion occurs if a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 54} It is well settled that, where an award of permanent custody is in the child's best interest, a six-month extension of temporary custody necessarily is not. *In re A.C.*, 2019-Ohio-4788, ¶ 43 (8th Dist.), citing *In re C.M.*, 2009-Ohio-943, ¶ 24 (9th Dist.) ("Where the trial court finds that it is in the best interest of a child to be placed in legal custody as a permanent disposition, the trial court must necessarily deny an extension of temporary custody.").

{¶ 55} On appeal, Mother claims the juvenile court should have continued temporary custody to allow her the opportunity to engage in and complete case-plan services. However, the best-interest determination focuses upon the child, not the parent. *In re C.T.*, 2021-Ohio-2274, ¶ 70 (8th Dist.). In this case, the statutory best interest factors and the children's need for stability and permanency supported the juvenile court's judgment. Although Mother reengaged with counseling after the permanent custody motion was filed, she required approximately five months of additional treatment services. Given Mother's history of drug abuse, her pattern of relapses, and the time needed to complete her case-plan services, the likelihood that the children could be reunified with Mother within the six-month extension period relied on mere conjecture. Accordingly, we find the juvenile court did not abuse its

discretion when it denied Mother's motion to extend temporary custody. *See In re G.B.,* 2017-Ohio-8759 (2d Dist.) (Denial of extension of temporary custody was not an abuse of discretion where father failed to substantially comply with four objectives of his case plan and permanent custody was in the children's best interest).

{¶ 56} The second assignment of error is overruled.

{¶ 57} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIMOTHY W. CLARY, JUDGE

MARY J. BOYLE, P.J., and
SEAN C. GALLAGHER, J., CONCUR